## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

_____

BH1, et al.,

      Plaintiffs

      v.

MICHAEL O. LEAVITT,
Secretary, United States Department of
Health And Human Services

      Defendant
_____)

Case No.: 1:06-cv-00070 (JR)

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ......................................................................................................3

I.      The Medicare Payment System .................................................................................3

II.     The Medicare DSH Adjustment..................................................................................4

III.    State Plans of Medical Assistance Under Title XIX ..............................................5

IV.     Demonstration Projects................................................................................................5

V.      The Secretary's Notice of Inconsistency ................................................................7

VI.     The Hospitals In This Case.........................................................................................9

LEGAL ARGUMENT...........................................................................................................10

I.      A Writ Of Mandamus Must Be Issued Because The Secretary, By Way Of The Interim
        Final Rule, Provided A Notice Of Inconsistency Requiring A Mandatory Reopening Of
        Past Cost Report Years Pursuant To 42 C.F.R. § 405.1885(b)..........................................10

CONCLUSION........................................................................................................................14

# <u>TABLE OF AUTHORITIES</u>

*Case:*                                                                                                          *Page(s):*

Cabell Huntington Hosp., Inc. v. Shalala,
    97 F.3d 984 (4th Cir. 1996) ...................................................................................11

Cookeville Reg'l Med. Ctr. v. Thompson,
    No. Civ.A. 04-1053 JR, 2005 WL 3276219 (D.D.C. 2005) ..................................... *passim*

Deaconess Health Servs. Corp. v. Shalala,
    83 F.3d 1041 (8th Cir. 1996) .................................................................................11

In Re: Medicare Reimbursement Litig.,
    414 F.3d 7 (D.C. Cir. 2005), <u>cert. den.</u>, 126 S.Ct. 1672 (2006)..................................10, 12

Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.,
    19 F.3d 270 (6th Cir. 1994) ...................................................................................11

Legacy Emanuel Hosp. & Health Ctr. v. Shalala,
    97 F.3d 1261 (9th Cir. 1996) .................................................................................11

Monmouth Med. Ctr. v. Thompson,
    257 F.3d 807 (D.C. Cir. 2001) .......................................................................11, 13, 14

Portland Adventist Med. Ctr. v. Thompson,
    399 F.3d 1091 (9th Cir. 2005) ...........................................................................9, 13

Pottgieser v. Kizer,
    906 F.2d 1319 (9th Cir. 1990) .................................................................................5


*Statutes, Regulations, and Other Authorities*:                                                                  *Page(s)*:

28 U.S.C. § 1361 ..........................................................................................................10

42 U.S.C. § 1315 ...........................................................................................................6
    § 1315(a) ..........................................................................................................5
    §§ 1315(a)(1), 1315(a)(2)(A) ................................................................................6
    § 1395f(b)(1) .....................................................................................................3
    § 1395oo(a) .......................................................................................................3
    § 1395 ww(d) .....................................................................................................3
    § 1395ww(d)(5)(F)(vi)(II) .....................................................................................5
    § 1396...............................................................................................................5
    § 1396a.............................................................................................................5
    §§ 1396(a)(10)(A), 1396(a)(1)................................................................................5

42 U.S.C. § 1396d.............................................................................................5
        § 1396d(a)............................................................................................5

42 C.F.R. § 405.1803.........................................................................................3
        § 405.1885(b)......................................................................................11
        §§ 413.20(b), 413.24(f)........................................................................3

65 Fed. Reg. 3136 (Jan. 20, 2000)...........................................................2, 7, 13

65 Fed. Reg. 47,054 (Aug. 1, 2002)..................................................................7

67 Fed. Reg. 50,096 (Aug. 1, 2002)..................................................................4

## INTRODUCTION

This case arises from the federal Government's failure to reimburse Tennessee hospitals properly for Medicare services they provided between 1994 and 1999. During that time period, the Secretary of Health and Human Services ("the Secretary") maintained an unlawful policy with respect to the calculation of the Medicare Disproportionate Share Hospital ("DSH") adjustment. The Medicare statute sets forth the proper method for calculating DSH, requiring that the DSH calculation include all patient days of service that a hospital provides to inpatients who are eligible for medical assistance under a State Plan approved under Title XIX of the Social Security Act. The Secretary, between 1994 and 1999, excluded a substantial portion of these days from the DSH calculation.

The specific patient days at issue in this case are days for which patients were eligible for medical assistance under Tennessee's section 1115 waiver program known as TennCare. These patient days include those for patients who would meet the eligibility criteria for traditional Medicaid as well as individuals who would not be eligible for Medicaid in the absence of the Tennessee waiver. This second category of individuals—patients who would not be eligible for Medicaid in the absence of the waiver—is referred to as an expansion population. The days of service associated with this population will hereinafter be referred to as "waiver days."

Every court to consider the issue of whether waiver days must be included in the DSH calculation, including this Court,[1] has found that the Medicare statute mandates that waiver days be included in the calculation. The real question in the present matter is whether the plaintiff

_____

[1] Cookeville Reg'l Med. Ctr. v. Thompson, No. Civ.A. 04-1053 JR, 2005 WL 3276219 (D.D.C. 2005)(appeal pending).

hospitals ("the Hospitals"), in an action for mandamus, can now recover the amounts that the Secretary unlawfully withheld. The answer is yes.

Although the Secretary maintained a policy for several years of excluding waiver days from the DSH calculation, he corrected that policy, prospectively, by an interim final rule on January 20, 2000. See 65 Fed. Reg. 3136 (Jan. 20, 2000). Under the Secretary's reopening regulation, 42 C.F.R. § 405.1885(b), the interim final rule constituted a notice to the intermediaries that the prior, unlawful payment determinations were "inconsistent" with existing law. Pursuant to section 405.1885(b), the Secretary and the intermediaries were required to reopen and correct all cost reports that were the subject of incorrect payment determinations issued during the three years preceding the issuance of the interim final rule. The facts in the present matter are the same, in all relevant respects, to the factual scenario confronted by the plaintiff hospitals in In Re: Medicare Reimbursement Litigation, 414 F. 3d 7 (D.C. Cir. 2005), cert. den., 126 S. Ct. 1672 (2006), and Monmouth Medical Center v. Thompson, 257 F. 3d 807 (D.C. Cir. 2001). The hospitals in those cases also sought recovery under a theory of mandamus, based on a notice of inconsistency. The Secretary fought each matter for years and ultimately lost both cases.[2]  Because the holdings in In Re: Medicare and Monmouth are controlling, and there are no material facts in dispute, summary judgment must be granted in favor of the Hospitals.

---

[2] In 2006, the Secretary even attempted to have the Supreme Court reverse In Re: Medicare and overrule Monmouth. The Supreme Court refused to revisit the issue.

**STATEMENT OF FACTS**

**I.    The Medicare Payment System**

Congress enacted the Medicare program (Title XVIII of the Social Security Act) in 1965. As originally enacted, Medicare was a health insurance program that furnished health benefits to participating individuals once they reached the age of 65.  For cost reporting years beginning before October 1, 1983, the Medicare program reimbursed hospital services on a "reasonable cost" basis.  42 U.S.C. § 1395f(b)(1).  In 1983, Medicare began reimbursing hospitals using the prospective payments system ("PPS").  42 U.S.C. § 1395ww(d).  Under PPS, hospitals are paid a fixed amount for each of approximately 490 diagnosis-related groups ("DRGs"), subject to certain payment adjustments.

The Secretary (or one or more of his predecessors, hereinafter collectively referred to simply as "the Secretary") has delegated much of the responsibility for administering the Medicare Program to the Centers for Medicare and Medicaid Services ("CMS").  The Secretary, through CMS, contracted out many of Medicare's audit and payment functions to entities known as fiscal intermediaries.

In order for a hospital to obtain Medicare reimbursement, it must, at the close of each fiscal year, submit to its intermediary a "cost report" showing both the costs incurred by it during the fiscal year and the appropriate share of those costs to be apportioned to Medicare.  42 C.F.R. §§ 413.20(b), 413.24(f).  The intermediary then audits the cost report and informs the hospital of its final determination of the amount of Medicare reimbursement through a notice of program reimbursement ("NPR").  42 C.F.R. § 405.1803.  A provider dissatisfied with its intermediary's determination may file an appeal with the Provider Reimbursement Review Board ("PRRB" or "Board") within 180 days of the date of the NPR.  42 U.S.C. § 1395oo(a).

3

In addition to filing an appeal, a provider may, in certain circumstances, obtain relief

through an intermediary's reopening of its cost report, without the involvement of the PRRB.

For example, under 42 C.F.R. § 405.1885(b), an NPR "must be reopened and revised by the

intermediary if . . . the Centers for Medicare & Medicaid Services notifies the intermediary that

such determination or decision is inconsistent with the applicable law, regulations, or general

instructions issued by the Centers for Medicare & Medicaid Services." <u>See</u> 67 Fed. Reg. 50,096

(Aug. 1, 2002) (citation omitted).   This type of mandatory reopening, under subsection

405.1885(b), is the subject of the present litigation.[3]

## II.    The Medicare DSH Adjustment

Hospitals that serve a disproportionate share of low-income patients, as the Hospitals in

this matter do, are eligible for upward adjustments to their Medicare PPS payments.  The

Secretary has delegated to CMS the authority to calculate and administer DSH adjustments as

part of the PPS reimbursement system.  CMS, in turn, delegates the responsibility to the fiscal

intermediaries who notify hospitals of their DSH adjustments on their NPRs.  The intermediaries

calculate the DSH adjustment by adding two fractions known colloquially as the Medicare Proxy

and the Medicaid Proxy.[4]   It includes, among other things, the categories of "patient days" that

should be included in the DSH calculation for those patients who were eligible for medical

assistance under a State plan approved under Title XIX:

> [T]he fraction (expressed as a percentage), the numerator of which
> is the number of the hospital's patient days for such period which
> consist of patients who (for such days) were eligible for medical
> assistance under a State plan approved under subchapter XIX of

---

[3] Subsections 405.1885(a) and (d) allow for a reopening at the request of the hospital or based on
a party's "fraud or similar fault."  Neither of those subsections is at issue in the present case.

[4] This case does not involve the Medicare proxy but is about the Medicaid proxy only.

> this chapter, but who were not entitled to benefits under Part A of
> this subchapter, and the denominator of which is the total number
> of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).   A larger number of patients in the numerator of the

Medicaid proxy means a larger DSH adjustment for the Hospital.

## III.    State Plans of Medical Assistance Under Title XIX

The Medicaid program, set forth in Title XIX of the Social Security Act, is a cooperative

federal-state program that furnishes health care to persons who meet specified eligibility

requirements, including low-income status.  See 42 U.S.C. § 1396; Pottgieser v. Kizer, 906 F.2d

1319, 1321 (9th Cir. 1990).  States participating in Medicaid have a substantial amount of

discretion in selecting the benefits provided under their Medicaid programs.  42 U.S.C. § 1396d.

Nevertheless, all participating states must furnish certain benefits, including inpatient hospital

services.  42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(1).

States that participate in the Medicaid program are required to develop a State Plan for

delivery of medical assistance, and to submit that Plan to the Secretary for approval.  42 U.S.C. §

1396.  The Plan must comply with certain requirements of the Medicaid statute set forth in 42

U.S.C. § 1396a.

## IV.    Demonstration Projects

A Federal statute, namely Section 1115 of Title XI of the Social Security Act, authorizes

the Secretary to waive certain Medicaid requirements in order to encourage states to create

innovative programs that are "likely to assist in promoting the objectives of . . .  [Title] XIX…."

42 U.S.C. § 1315(a).  The stated objective of Title XIX is to provide medical assistance to

individuals "whose income and resources are insufficient to meet [certain health care costs

including inpatient hospital services]." 42 U.S.C. § 1396d(a).  In order to foster the development

of demonstration projects, also known as waiver programs,  Section 1115 allows the Secretary to

waive compliance with certain of the requirements for Medicaid State Plans set out in 42 U.S.C.

§ 1396a.  The costs associated with demonstration projects under Section 1115 are statutorily

deemed to be expenditures under an approved Title XIX State Plan.  See  42 U.S.C.  §§

1315(a)(1), 1315(a)(2)(A).  Section 1115 provides in relevant part:

> (1) [T]he Secretary may waive compliance with any of the
> requirements of section . . . 1396a . . . to the extent and for the
> period he finds necessary to enable such State or States to carry out
> such project, and
> (2)(A) costs of such project which would not otherwise be included
> as expenditures under . . . 1396b . . . shall, to the extent for the
> period prescribed by the Secretary, be regarded as expenditures
> under the State plan or plans approved under such subchapter, or
> for administration of such State plan or plans, as may be
> appropriate . . . .

42 U.S.C. §§ 1315(a)(1), 1315(a)(2)(A).

In some cases, a waiver program covers patients who otherwise could have been made

eligible for Medicaid under the State Plan requirements set forth in 42 U.S.C. § 1396a.  In other

cases, waiver programs may provide for medical assistance to expanded eligibility populations of

low income individuals who would not be eligible for Medicaid in the absence of a waiver.  See

42 U.S.C. § 1315.  As noted in the introduction, the patient days of service associated with these

expansion populations, made eligible through a waiver, are referred to as "waiver days."

Tennessee has operated an approved Section 1115 waiver program, known as TennCare,

since January of 1994.  TennCare covers, among others, individuals who are not eligible for

traditional Medicaid and who are uninsurable or do not have access to employer-sponsored

healthcare.[5]  Thus, the TennCare program affords health care benefits to expansion populations

and has covered such patients ever since the program's inception.[6]

The Secretary, from 1994 until January 2000, interpreted the Medicare statute as

excluding waiver days from the Medicaid proxy of the DSH calculation.  The Secretary issued

various policy statements and memoranda prohibiting providers from claiming, and

intermediaries from counting, waiver days in the DSH calculation.

## V.      The Secretary's Notice of Inconsistency

In January of 2000, the Secretary issued an interim final rule wherein he changed his

position so as to include waiver days in the DSH calculation.  See Interim Final Rule, 65 Fed.

Reg. 3136 (Jan. 20, 2000).[7]  In the interim final rule, the Secretary noted that "[o]ne purpose of a

section 1115 expansion waiver is to extend Title XIX matching payments to services furnished to

populations that otherwise could not have been made eligible for Medicaid," and that section

1115(a)(2)(A) "allows for the expansion populations to be treated as Medicaid beneficiaries."

Id. at 3137.

The Secretary declared, in both the interim final rule and the commentary that

accompanied it, that waiver days would be included in the DSH calculation prospectively,

beginning with patient discharges on January 20, 2000.  Id. at 3136-37.  The Secretary stated that

he was "revising the policy, effective with [patient] discharges occurring on or after January 20,

2000, to allow hospitals to include the patient days of all populations eligible for Title XIX

matching payments in a State's Section 1115 waiver in calculating the hospital's Medicare DSH

---

5    See Cookeville, 2005 WL 3276219, at *3.

6    Id.

7    The interim final rule was adopted as the final rule on August 1, 2000.  See Final Rule, 65
     Fed. Reg. 47,054 (Aug. 1, 2000).

adjustment." Id.  The Secretary stated that he made this change so that the intermediaries'

calculation of the Medicare DSH adjustment would be "fully consistent" with the Medicare

statute:

> [W]e believe allowing hospitals to include the section 1115
> expanded waiver population in the Medicare DSH calculation is
> fully consistent with the Congressional goals of the Medicare DSH
> adjustment to recognize the higher costs to hospitals of treating
> low income individuals covered under Medicaid.  Therefore,
> inpatient hospital days for these individuals eligible for Title XIX
> matching payments under a section 1115 waiver are to be included
> as Medicaid days for purposes of the Medicare DSH adjustment
> calculation.

Id. at 3137.

The Secretary, by providing notice to his intermediaries that they must include waiver

days in the DSH calculation in order to be "fully consistent" with the Medicare statute,

effectively provided notice to the intermediaries that their prior determinations, which excluded

waiver days under a policy that was exactly the opposite of the interim final rule, were

inconsistent with the statute.  In other words, the interim final rule, and the commentary

accompanying it, constituted a notice of inconsistency under 42 C.F.R. § 405.1885(b).  Pursuant

to that regulation, the Secretary had a mandatory, non-discretionary duty to reopen all of the

NPR's issued during the three years prior to January 20, 2000 and to correct those determinations

so as to include waiver days in the DSH calculation.  The Secretary, however, did not issue any

reopenings or corrected NPR's to include waiver days in the DSH calculation as required by the

reopening regulation.

The fact that the intermediaries issued determinations that were inconsistent with the

Medicare statute (with respect to patient discharges prior to January 20, 2000) cannot reasonably

be disputed.  Each court that has considered the issue has held that waiver days must be included

in the calculation.  See Cookeville, 2005 WL 3276219 (D.D.C. 2005) (granting summary

judgment); <u>Portland Adventist Med. Ctr., et al. v. Thompson</u>, 399 F.3d 1091, 1099 (9th Cir.

2005) (affirming District Court's grant of summary judgment).  In <u>Portland Adventist</u>, the court

held that "[t]he text of the [Medicare] statute, the intent of Congress, and the decisions of this

and other courts make it plain that the entire low-income population actually served by the

hospitals—including § 1115 expansion populations—must be accounted for in the DSH

Medicaid fraction."  399 F.3d at 1099.   In <u>Cookeville</u>, this Court also held that "expansion

populations. . . must be included in the DSH calculation."  <u>Cookeville</u>, 2005 WL 3276219 at *4.

  The only issue that remains is whether the Hospitals in the present matter are entitled to a

writ of mandamus to compel the Secretary and his intermediaries to perform their non-

discretionary duty, pursuant to 42 C.F.R. § 405.1885(b), to reopen the NPR's that the

intermediary issued to the Hospitals during the three year period prior to January 20, 2000.

**VI.    The Hospitals in This Case**

  The Hospitals in the present matter are comprised of twenty-four acute care hospitals.

Each Hospital is a licensed Medicare and Medicaid provider that provided care to indigent

patients eligible for Tennessee's section 1115 waiver program.  For each of the cost report years

at issue in this case (which are set forth in the Hospitals' Complaint), the Hospitals were either

eligible for a DSH adjustment or would have been eligible to receive a DSH adjustment if the

Secretary had properly included waiver days in the DSH calculation.

  The interim final rule constituted a notice of inconsistency for purposes of the Secretary's

reopening regulation, 42 C.F.R. § 405.1885(b), and required the reopening of all cost reports

issued to the Hospitals in the three years prior to the publication of the interim final rule.

Accordingly, the Secretary must reopen all NPR's that the intermediaries issued to the Hospitals

between January 20, 1997 and January 20, 2000, and recalculate the DSH adjustment so as to include waiver days.

## LEGAL ARGUMENT

I.    **A Writ of Mandamus Must be Issued Because the Secretary, by Way of the Interim Final Rule, Provided a Notice of Inconsistency Requiring a Mandatory Reopening of Past Cost Report Years Pursuant to 42 C.F.R. § 405.1885(b).**

A writ of mandamus compels an officer or employee of the United States or any federal agency to perform a non-discretionary duty owed to the plaintiffs.  See  28 U.S.C. § 1361.  In order to obtain a writ of mandamus, a plaintiff must possess a clear right to relief, the government actor must have had a clear duty to act, and there can be no other adequate remedy available to the plaintiff.  See In Re: Medicare, 414 F. 3d at 10.

The mandatory, non-discretionary duty at the center of this case is the duty of the Secretary and the intermediary, under 42 C.F.R. § 405.1885(b), to reopen closed cost reports when the Secretary has provided notice to the intermediary that the payment determinations for those closed cost reports, i.e. the NPR's, were inconsistent with the law.  The In Re: Medicare and Monmouth cases that are controlling in the present matter involved the issue of whether a CMS Ruling regarding the Medicare DSH calculation constituted a "notice of inconsistency" under 42 C.F.R. § 405.1885(b).[8]  The Ruling, known as Ruling 97-2, dealt with the issue of whether intermediaries must include in the DSH calculation inpatient days of service for those patients who were eligible for Medicaid, but for whom Medicaid had made no payment.  These patient days are known as "eligible but unpaid days."  Id.

---

[8] The Ruling was actually issued by the Health Care Finance Administration.  But, as noted in the Statement of Facts above, for purposes of consistency, the acronym of the successor agency, CMS, is used throughout this brief.

In the early and mid-1990's, the Secretary vigorously opposed the attempted inclusion of eligible but unpaid days in the DSH calculation in a series of court cases, all of which the Secretary lost.  See Cabell Huntington Hosp., Inc. v. Shalala, 101 F.3d 984 (4th Cir. 1996); Legacy Emanuel Hosp. & Health Ctr. v. Shalala, 97 F.3d 1261 (9th Cir. 1996); Deaconess Helath Servs. Corp. v. Shalala, 83 F.3d 1041 (8th Cir. 1996); Jewish Hosp., Inc. v. Sec'y of Health & Human Servs., 19 F.3d 270 (6th Cir. 1994).  Following these losses, the Secretary issued Ruling 97-2, which mandated that intermediaries include eligible but unpaid days in the Medicare DSH calculation for all unsettled cost reports, i.e. cost reports for which no NPR had been issued.  See Monmouth, 257 F.3d at 810.  Ruling 97-2 was prospective only and prohibited intermediaries from reopening NPR's that had already been issued (those NPR's that had been issued prior to February 27, 1997).

The plaintiff hospitals in both Monmouth and In Re: Medicare argued that Ruling 97-2 was, in fact, a "notice of inconsistency" for purposes of the Secretary's reopening regulation, 42 C.F.R. § 405.1885(b).  The plaintiff hospitals in those cases argued that the Secretary, by publishing Ruling 97-2 and requiring the prospective inclusion of unpaid days, "in effect announced a finding of inconsistency even while purporting to veto reopening."  Monmouth, 257 F.3d at 813 (parentheses omitted).  The Court held that the hospitals were correct, "[c]oncluding that the Secretary did in fact give notice of the [prior policy's] inconsistency with applicable law," and found that "405.1885(b) imposed a clear duty on intermediaries to reopen DSH payment determinations for the hospitals."  Id. at 814.

Subsequently, the Secretary, in the In Re: Medicare case, attempted to argue that the plaintiff hospitals should not be able to avail themselves of a mandamus theory because they neither filed appeals with the PRRB nor filed reopening requests with the intermediary.  This

Court, and the Court of Appeals, rejected the Secretary's argument. "[G]iven that section 405.1885(b) does not require hospitals to file anything at all to obtain relief, we see no basis for holding that only those hospitals that appealed or sought section 405.1885(a) reopening have a personal right to the reopening required by section 405.1885(b)." In Re: Medicare, 414 F.3d at 11. The Court of Appeals further held: "Indeed, the fact that section 405.1885(b) contains no prerequisite for relief beyond a notice of inconsistency suggests that all hospitals undercompensated due to an erroneous interpretation of the law have a personal right to section 405.1885(b) reopening." Id. at 11-12.

In the present matter, the notice of inconsistency that triggers a mandatory reopening under section 405.1885(b) is the interim final rule regarding the inclusion of waiver days. The interim final rule, like Ruling 97-2 in the Monmouth and In Re: Medicare decisions, prospectively required intermediaries to include an additional category of patient days in the Medicare DSH calculation. In Monmouth and In Re: Medicare, the additional category of patient days was the eligible but unpaid Medicaid days. In the present matter, the additional category of days is waiver days.

The Court's decisions with respect to both the interim final rule (in the case of waiver days) and Ruling 97-2 (in the case of eligible but unpaid days) have uniformly held that the omitted patient days were required by the Medicare statute to be included in the DSH calculation and that the Secretary had no discretion to exclude such days. Indeed, the Court of Appeals for the Ninth Circuit found the Secretary's refusal to calculate DSH properly and follow the clear mandate of the Medicare statute, in the specific context of waiver days, could only be explained by the Secretary's traditional hostility to DSH:

> This appears to be the latest in a series of cases in which the Secretary has refused to implement the DSH provision in

conformity with the intent behind the statute.  In each of these
cases, the court rejected the Secretary's position.  The same result
must follow here.

Portland Adventist, 399 F.3d at 1099.

In both the present matter involving the interim final rule, and in the cases dealing with

Ruling 97-2, the change in reimbursement ordered by the Secretary was a correction intended to

make prospective payment determinations consistent with the Medicare DSH statute.  Indeed, in

the instance of the interim final rule, the Secretary explicitly stated that the 180 degree change in

reimbursement policy now makes DSH payments "fully consistent" with the Medicare statute.

See Interim Final Rule, 65 Fed. Reg. 3136-37 (Jan. 20, 2000).  The interim final rule was,

therefore, clearly a notice that prior determinations were inconsistent with the statute.  As the

Court in Cookeville held, the Secretary cannot "have it both ways" and maintain that neither the

payment policy in effect prior to January 20, 2000, nor the policy that followed thereafter,

violated the Medicare statute:

> The Secretary cannot have it both ways. Medical assistance provided
> to expansion populations is either part of a state plan approved under
> Title XIX, or it is not. If the medical assistance provided through
> demonstration projects indeed flows from a "separate [Title XI]
> expenditure authority," as the Secretary maintained, it would
> contravene the statute to include expansion populations in the DSH
> formula no less than it would to exclude them if such assistance
> flows from Title XIX, as plaintiffs claim. Thus, the only way the
> Secretary's pre-2000 exclusionary policy could have been lawful is if
> his current policy of inclusion were unlawful.

Cookeville, 2005 WL 3276219 at *6.

Although the interim final rule is not labeled as a "notice of inconsistency," it does not

have to bear that title in order to qualify as a notice of inconsistency for purposes of 42 C.F.R. §

405.1885(b).  In Monmouth, the Court of Appeals observed that "[t]o be sure, HCFAR 97-2

studiously avoided using the magic words 'inconsistent with the applicable law' and instead

called the earlier interpretation 'contrary to the applicable law in four judicial circuits.'"

<u>Monmouth</u>, 257 F. 3d at 813. The Court nevertheless held that the Secretary, through Ruling 97-2, "did in fact give notice of the interpretation's inconsistency with applicable law . . .." <u>Id.</u> at 814. The present matter is no different, but presents an even more compelling basis for finding a notice of inconsistency because the Secretary, as noted above, underscores that the 180 degree reversal of payment policy is "fully consistent" with the DSH statute. This necessarily means that the prior payment policy (which excluded waiver days from the DSH calculation), that had prevailed up until the publication of the interim final rule, was necessarily fully inconsistent with the Medicare statute.

Based on the foregoing, it cannot be reasonably disputed that the interim final rule constitutes a notice of inconsistency for purposes of section 405.1885(b). This triggers a mandatory duty on the part of the Secretary and the intermediary to reopen all NPR's issued to the Hospitals during the three year period beginning on January 20, 1997 and ending on January 20, 2000. The Hospitals respectfully request that summary judgment be entered in their favor and that the Secretary be compelled to accept documentation from the Hospitals regarding the excluded waiver days for the fiscal years identified in the Complaint, and to process corrected payments within 90 days of receiving the documentation.

### CONCLUSION

For the foregoing reasons, the Hospitals request that summary judgment be granted in their favor and that the Secretary be ordered to reopen all cost reports that were the subject of NPR's issued between January 20, 1997 and 2000.

14

Respectfully submitted,


  /s/ Jacqueline E. Bennett
Murray J. Klein
DC Bar #492415
Jacqueline E. Bennett
DC Bar #474355
**REED SMITH LLP**
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, DC  20005
(202) 414-9200
(202) 414-9299 facsimile
JBennett@ReedSmith.com

Dated:  June 6, 2006