IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BH1, et al.                          )
                                     )
        Plaintiffs,                  )
                                     )
        v.                           )        Civ. Action No. 06-0070 (JR)
                                     )
MICHAEL O. LEAVITT,                  )
                                     )
        Defendant.                   )
_____)

## DEFENDANT'S MOTION TO DISMISS

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), defendant respectfully moves this Court

for an order dismissing plaintiffs' complaint for lack of subject-matter jurisdiction and failure to

state a claim.  For the reasons in support of these motions, defendant respectfully refers the Court

to the attached memorandum of points and authorities.  A proposed order is attached.

Respectfully submitted,

_____/s/_____
KENNETH L. WAINSTEIN
United States Attorney
D.C. Bar No. 451058

_____/s/_____
PETER S. SMITH
Assistant United States Attorney
D.C. Bar No. 465131
Civil Division
555 4th Street, N.W.
Washington, D.C.  20530
(202) 307-0372/FAX: (202) 514-8780

DAVID HOSKINS
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
330 Independence Ave., S.W., Room 5309
Washington, D.C. 20201

OF COUNSEL:

PAULA M. STANNARD
Acting General Counsel

KATHLEEN H. MCGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation

United States Department of Health
and Human Services

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BH1, <u>et al.</u> | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 1:06cv00070 (JR) |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S MEMORANDUM
<u>IN SUPPORT OF THIS MOTION TO DISMISS</u>**

**INTRODUCTION**

Plaintiffs, Medicare-participating hospitals located in the State of Tennessee, ask this

Court to issue a writ of mandamus directing the Secretary of the United States Department of

Health and Human Services (HHS) to reopen and revise determinations regarding the amount of

Medicare payment due the hospitals.  Mandamus relief is drastic and is available only in

extraordinary circumstances.  To qualify for mandamus relief, plaintiffs must demonstrate that

they have a clear right to relief, that the defendant has a clear duty to act, and that plaintiffs have

no alternative avenues of relief (even then mandamus may be withheld for equitable reasons).

Plaintiffs cannot meet this high burden.

This case concerns a statutory provision that provides additional Medicare payments to

hospitals that serve a disproportionate share of low income patients, as determined in accordance

with the statute and implementing regulations.  These payments are referred to as Medicare

"DSH" [disproportionate share hospital] payments.  On January 20, 2000, the Secretary

published an interim final rule in the Federal Register to revise (prospectively) a policy regarding

the Medicare DSH calculation.  At issue in this case is whether this prospective change in policy gives plaintiffs a right to mandamus relief with regard to Medicare payment determinations for periods prior to January 20, 2000.

Plaintiffs did not seek administrative review with respect to the payment determinations at issue.  Plaintiffs' complaint alleges that the Secretary's duty to change prior payment determinations arises from 42 C.F.R. § 405.1885(b).  This regulation provides for reopening of a payment determination if the Centers for Medicare & Medicaid Services (CMS), a component of HHS, provides notice that the determination was "inconsistent with the applicable law . . . ."  Plaintiffs contend that the Secretary's change in Medicare DSH policy constitutes notice that the prior policy was inconsistent with the underlying statute and therefore, under 42 C.F.R. § 405.1885(b), the Secretary has a duty to reopen the payment determinations for plaintiff hospitals in more than a hundred fiscal years.  Plaintiffs' claims fail for a number of reasons.

First, plaintiffs cannot demonstrate that the Secretary provided notice that the payment determinations at issue were "inconsistent with the applicable law," because in fact the payment determinations were <u>not</u> inconsistent with the applicable law.  In a recently enacted statute, Congress clarified the underlying statute and explicitly ratified the validity of the Secretary's prior policy.  Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (February 8, 2006) (codified in part at 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)) ("DRA").

Second, plaintiffs cannot demonstrate that the Secretary has given "notice" that his prior policy was inconsistent with the applicable law.  The January 20, 2000 Federal Register document does not state that the prior policy was inconsistent with the underlying statute, nor does it provide for reopening of prior payment determinations.  Relying upon <u>Monmouth</u>

Medical Center v. Thompson, 257 F.3d 807, 811 (D.C. Cir. 2001), plaintiffs theorize that when

the Secretary changed his policy, the Secretary actually provided notice that his previous policy

was inconsistent with the applicable law.  This theory is faulty.  Plaintiffs seek to extend the

reasoning of Monmouth far beyond the context in which that case was decided.  As demonstrated

below, this case is distinguishable from Monmouth.  Plaintiffs' claims lack merit and should be

dismissed.

## BACKGROUND

A.    **Statutory and Regulatory Background**

1.    **Medicare and the DSH Adjustment.**

Title XVIII of the Social Security Act, the Medicare statute, establishes a program of

health insurance for the elderly and disabled.  This case arises under Part A of the Medicare

program, which provides payments for inpatient hospital services and related care.  42 U.S.C.

§§ 1395c et seq.  Since 1983, the operating costs of inpatient hospital services have been paid

primarily through the Prospective Payment System ("PPS"), 42 U.S.C. § 1395ww(d).  Generally

speaking, an individual hospital's PPS payment is based on prospectively-determined national

rates for each discharge, rather than on the actual operating costs incurred by the hospital.  42

U.S.C. § 1395ww(d)(1)-(4).  However, the PPS contains a number of provisions that adjust

payments on the basis of hospital-specific factors.  See, e.g., id. § 1395ww(d)(5).  This case

involves one of those hospital-specific adjustments.

In 1986, Congress enacted a provision known as the Medicare disproportionate share

hospital ("DSH") adjustment.  Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.

L. No. 99-272, § 9105, 100 Stat. 82 (1986).[1]  This provision requires the Secretary of the United

States Department of Health & Human Services to provide increased PPS payments to hospitals

that serve a "significantly disproportionate number of low-income patients."  42 U.S.C.

§ 1395ww(d)(5)(F)(i)(I).  Congress enacted this provision because it determined that such

hospitals generally incur higher per-case Medicare costs.  See, e.g., H.R. Rep. No. 99-241 at 16

(1986), reprinted in 1986 U.S.C.C.A.N. 579, 594.

　　　Whether a hospital qualifies for the Medicare DSH adjustment, and how large an

adjustment it receives if it does qualify, depend primarily on the hospital's "disproportionate

patient percentage."  See 42 U.S.C. § 1395ww(d)(5)(F)(v).  Congress provided a statutory

definition of "disproportionate patient percentage," which is codified at 42 U.S.C.

§ 1395ww(d)(5)(F)(vi).  The definition of "disproportionate patient percentage" consists of two

components.  The first component, not relevant to this case, is known as the "Medicare fraction."

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).  The second component, known as the "Medicaid fraction,"

which is at the heart of this case, uses Medicaid eligibility as a proxy for low income.  Until

February of 2006, the statutory section read as follows:

---

[1] The 1986 DSH provision at issue here was initially set to expire in 1988.  See Pub. L. No. 99-272 § 9105(a), 100 Stat. 82.  Congress provided several limited extensions, then in 1990 extended the provision indefinitely.  See Pub. L. No. 99-509 § 9306(c), 100 Stat. 1874, 1995 (1986 extension until 1989); Pub. L. No. 100-203 § 4003(c), 101 Stat. 1330-46 (1987 extension until 1990); Pub. L. No. 100-647 § 8401, 102 Stat. 3342, 3798 (1988 extension until 1995); Pub. L. No. 101-508 § 4002(b)(3), 104 Stat. 1388-32 (indefinite extension).

the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of *patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter* [i.e., the Medicaid program], but who were not entitled to benefits under part A of this subchapter [i.e., the Medicare program], and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)(2005) (emphasis added).[2]  Generally under this equation, a

hospital's Medicare DSH adjustment grows as the count of patient days in the numerator of the

Medicaid fraction increases.  See id.; 42 U.S.C. § 1395ww(d)(5)(F)(vii)- (xiii).

## 2.    Medicaid

Medicaid (as opposed to Medicare) is a cooperative federal-state program which provides

medical assistance to low-income persons and other individuals who face serious financial

burdens in paying for needed medical care.  42 U.S.C. §§ 1396 et seq.; 42 C.F.R. §§ 430.0 et seq.

(implementing regulations).  In order to participate in the Medicaid program, a State must submit

a plan for medical assistance to the Centers for Medicare & Medicaid Services ("CMS")

(formerly known as the Health Care Financing Administration ("HCFA")), which administers

Medicaid on behalf of the Secretary of Health & Human Services.  42 U.S.C. § 1396a.  The State

plan specifies, inter alia, the categories of individuals who will receive medical assistance under

the plan and the specific kinds of medical care and services that will be covered.  If the State plan

is approved by the Secretary, the State is thereafter eligible to receive matching payments from

the federal government based on a specified percentage (the "Federal medical assistance

---

[2] As discussed below, Congress has amended this provision to add new language that is material to this lawsuit.  See Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5002, 120 Stat. 4, * (2006) ("the DRA").

percentage") of the amounts "expended * * * as medical assistance under the State plan." Id. §§ 1396b(a)(1), 1396d(b).

The Medicaid statute establishes a number of requirements that must be met in order for a State plan to be approved. See generally id. §§ 1396a(a)(1)-(65). In particular, the Medicaid statute sets forth a number of requirements, including income and resource limitations, that apply to individuals who wish to receive medical assistance under the State plan. See, e.g., id. §§ 1396a(a)(10)(A)(i)(IV), (VI), (VII); see also id. § 1396b(f). Individuals who do not meet the applicable requirements, either by reason of their income levels or for other reasons, are not eligible for medical assistance under the State plan.

### 3.    Section 1115 Demonstration Projects

State Medicaid plans are approved pursuant to title XIX of the Social Security Act. Title XI of the Social Security Act, however, authorizes demonstration projects to allow states to explore innovative health-care initiatives. See 42 U.S.C. § 1315 (section 1115 of the Social Security Act).

A State that wishes to conduct a demonstration project under section 1115 of the Social Security Act submits an application to the Secretary. The Secretary may approve such an application if, "in the judgment of the Secretary," the demonstration project is "likely to assist in promoting the objectives" of certain programs established under the Social Security Act, including Medicaid. 42 U.S.C. § 1315(a). A demonstration project may provide benefits to individuals who do not qualify for Medicaid benefits under the Medicaid statute, or may provide benefits not otherwise authorized by the Medicaid statute. Id. To facilitate the operation of approved demonstration projects, the Secretary may "waive compliance with" specified

requirements of title XIX, "to the extent necessary and for the period * * * necessary" to enable

the State to carry out the demonstration project. Id. § 1315(a)(1).  In addition, the Secretary may

direct that costs of the project that would not otherwise qualify as Medicaid expenditures "shall,

to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the

State [Medicaid] plan." Id. § 1315(a)(2)(A).  To the extent the Secretary authorizes the costs of a

demonstration project to be "regarded as expenditures under the State plan," the State may

receive federal matching payments for those costs under 42 U.S.C. § 1396b. Id.  Individuals who

are not eligible for medical assistance under a Medicaid State plan approved under Title XIX, but

who are eligible for medical assistance under a demonstration project approved under Title XI,

are referred to as "expansion waiver populations" or "expansion populations."

**4.    The Counting of Section 1115 Expansion Population Days For Purposes of Medicare DSH**

a.  Prior to January 20, 2000, the policy of the United States Department of Health and

Human Services (HHS) was to exclude section 1115 expansion population patient days from the

numerator of the Medicaid fraction of the Medicare DSH calculation. See, e.g., 42 C.F.R.

§ 412.106(b)(4) (1999) (numerator of Medicaid fraction of Medicare DSH calculation includes

patient days of patient "eligible for Medicaid" but not entitled to Medicare Part A).  Expansion

populations are not eligible for medical assistance under a State plan approved under title XIX,

but instead receive benefits under a demonstration project approved under title XI.

b.  In an interim final rule with a comment period, which was published in the Federal

Register on January 20, 2000, HHS revised (prospectively) its longstanding policy on the

treatment of section 1115 expansion population days.  Specifically, the agency decided "to allow

hospitals to include the patient days of all populations eligible for Title XIX matching payments

in a State's section 1115 waiver in calculating the hospital's Medicare DSH adjustment."  65 Fed.

Reg. 3136 (Jan. 20, 2000).  The Secretary promulgated the following regulations text:

> Effective with discharges occurring on or after January 20, 2000, for purposes of counting days under paragraph (b)(4)(i) of this section, hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act.

42 C.F.R. § 412.106(b)(4)(ii) (2000).  HHS explained that "[u]nder current policy . . . expanded

eligibility groups [under section 1115 expansion waiver demonstration projects] . . . were not to

be included in the Medicare DSH calculation."  65 Fed. Reg. at 3136.

HHS stated that "including expanded waiver populations in the Medicare DSH

calculation is fully consistent with the congressional goals of the Medicare DSH adjustment to

recognize the higher costs to hospitals of treating low income individuals covered under

Medicaid."  Id. at 3137.  HHS did not state that the statute required the counting of section 1115

expansion population days in the numerator of the Medicaid fraction of the Medicare DSH

calculation, nor did it state that the prior policy of excluding such days was inconsistent with

congressional intent.

### 5.    The Administrative Review Process

A program that processes as many claims as Medicare requires a meaningful element of

finality in order to function.  Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449,

454-56 (1999).  The efficient operation of the program also requires that the health care-

providers submit complete claims for reimbursement and call attention to any disputed claims at

an early stage.  To facilitate these public-policy imperatives, hospitals that receive Part A

payments are required to submit annual cost reports to their designated intermediary.  See 42

C.F.R. §§ 413.20-413.24.  These reports commonly run into the hundreds of pages and contain

"thousands of cost items, any one of which may give rise to a reimbursement issue."  67 Fed.

Reg. 49,982, 50,100 (Aug. 1, 2002); see also Athens Cmty. Hosp., Inc. v. Shalala, 743 F.2d 1, 3

(D.C. Cir. 1984) ("We are informed that a cost report, when completed, is approximately three-

quarters of an inch thick.").  To permit efficient processing of these voluminous reports, the

Medicare regulations require health-care providers to "furnish such information to the

intermediary as may be necessary" to "[a]ssure proper payment by the program."  42 C.F.R.

§ 413.20(d)(1)(i).  This includes all "cost, revenue, statistical, and other information pertinent to

reimbursement."  42 C.F.R. § 413.20(c)(2).[3]  On the basis of the cost report submitted by the

hospital, the intermediary makes a "determination," also known as a "notice of program

reimbursement" (NPR), of the total amount the hospital should be reimbursed for the services it

rendered to Medicare beneficiaries during the reporting period.  42 C.F.R. § 405.1803.

The intermediary's notice of program reimbursement is "final" unless it is either appealed

or reopened within the time frames established by Medicare statutes and regulations.  42 C.F.R.

§ 405.1807.  If the amount in controversy is at least $1,000 but less than $10,000, the hospital

may demand a hearing before the intermediary itself, 42 C.F.R. § 405.1809, within 180 days of

the determination.  42 F.R. § 405.1811(a).

---

[3] See also 42 C.F.R. § 413.24(c) (provider must furnish "cost information" that is
"[a]dequate" to "support payments made for services furnished to beneficiaries"), § 413.20(a)
(provider required to "maintain sufficient financial records and statistical data for proper
determination of costs payable under the program" and must use "reporting practices that are
widely accepted in the hospital and related fields"), § 413.20(c)(1) (provider must have an
"adequate ongoing system for furnishing the records needed to provide accurate cost data and
other information capable of verification by qualified auditors").

If the amount in controversy is $10,000 or more, the hospital may demand a hearing before the Provider Reimbursement Review Board ("PRRB" or "the Board").  42 U.S.C. §§ 1395oo(a)(1)-(2); 42 C.F.R. § 405.1835.  The demand for a Board hearing must be made within 180 days after the intermediary's determination is mailed to the provider.  42 U.S.C. § 1395oo(a)(3); 42 C.F.R. § 405.1841(a).

After its hearing, the Board renders a decision, 42 C.F.R. § 405.1871(a), that the Secretary, in his discretion, may then review.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875. After a final decision is reached, the hospital has 60 days to seek judicial review in district court. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877.  A hospital that fails to claim reimbursement for an item on its cost report and/or fails to seek administrative review of an adverse intermediary determination ordinarily may not obtain subsequent judicial review of a disputed payment issue. See Illinois Council, 529 U.S. at 11-25; Your Home, 525 U.S. at 454-57; Heckler v. Ringer, 466 U.S. 602, 618-19 (1984).  This appeal procedure was available to plaintiffs, and they could (and should) have raised their claims that the Secretary had inappropriately excluded section 1115 expansion population patient days from their DSH calculations in timely filed appeals.  There is no dispute that plaintiffs failed to seek this relief.

### 6.     The Reopening Regulation

In addition to the potential revisions available through the administrative and judicial avenues of review created by Congress in 42 U.S.C. § 1395oo, the final payment determinations of an intermediary also may be subject to reopening, pursuant to a regulation promulgated "by the grace of the Secretary," Your Home, 525 U.S. at 454, at 42 C.F.R. § 405.1885.  The terms of this reopening regulation must be narrowly construed, however, so not to "frustrate the statutory

purpose" of 42 U.S.C. § 1395oo by, among other things, "permitting requests to reopen to be reviewed indefinitely." <u>Your Home</u>, 525 U.S. at 454. Reopening of an otherwise final payment determination is available in three settings.

First, the hospital may ask the intermediary to reopen the determination "within 3 years of the date" of the notice of program reimbursement. 42 C.F.R. § 405.1885(a). The intermediary "may," in the exercise of its discretion, grant or deny the request. <u>Id.</u> A denial of reopening cannot be appealed to the Board and is unreviewable in district court. <u>Your Home</u>, 525 U.S. at 456-57; <u>Monmouth Med. Ctr. v. Thompson</u>, 257 F.3d 807, 811 (D.C. Cir. 2001).

Second, the intermediary may be placed under a mandatory duty to reopen if, within the same three-year period, CMS notifies the intermediary that a payment determination "is inconsistent with the applicable law, regulations, or general instructions" issued by CMS. 42 C.F.R. § 405.1885(b)(1)(i); 42 C.F.R. § 405.1885(b) (2001). Under the current language of the regulation which took effect in 2002, a notice of inconsistency must "[e]xplicitly direct[] the intermediary to reopen and revise the intermediary determination," 42 C.F.R. § 405.1885(b)(1)(ii), and, in any event, "[a] change in legal interpretation or policy by CMS," "whether made in response to judicial precedent or otherwise, is not a basis for reopening an intermediary determination." 42 C.F.R. § 405.1885(b)(2). These caveats do not appear expressly in the language that was in effect prior to 2002, but the Secretary has indicated that such was always his intent. 67 Fed. Reg. at 50,099-100. Under either version of the regulation, the Secretary is under no legal duty to issue a notice of inconsistency. The intermediary's duty to reopen arises "only <u>if</u> [CMS] determines that a prior decision or set of decisions is inconsistent with applicable law." <u>Monmouth</u>, 257 F.3d at 812 (emphasis added). <u>Whether</u> or <u>when</u> to issue

a notice of inconsistency is committed to the unreviewable discretion of CMS.  See Your Home, 525 U.S. at 457; Monmouth, 257 F.3d at 813.

> 7.    **Litigation Regarding the Secretary's Policy of Excluding Section 1115 Population Days Prior to January 20, 2000**

Prior to publication of the Interim Final Rule on January 20, 2000, no hospital had pursued administrative or judicial review with respect to the Secretary's policy of excluding section 1115 expansion population days from the numerator of the Medicaid fraction of the Medicare DSH calculation.  After publication of the January 20, 2000 Interim Final Rule, a number of hospitals pursued administrative review and then judicial review.  In three related cases in the Ninth Circuit, nine hospitals pursued administrative appeals to challenge the Secretary's policy and subsequently sought judicial review.  Portland Adventist Med. Ctr. v. Thompson, 399 F.3d 1091, 1098 (9th Cir. 2005); Portland Adventist Med. Ctr. v. Thompson, No. 03-889 (JO) (D. Or. filed Jan. 16, 2004) ("Portland Adventist II");  Portland Adventist Med. Ctr. v. Thompson, No. 05-192 (JE) (D. Or. filed Feb. 9, 2005) ("Portland Adventist III").  Similarly, the Secretary's policy has been challenged in this Circuit by hospitals that pursued administrative appeals and then sought judicial review.  Cookeville Reg'l  Med. Ctr.  v. Thompson, 2005 WL 3276219 (D.D.C. Oct. 28, 2005), final judgment entered (D.D.C. Feb. 2, 2006), Rule 59(e) motion to alter judgment filed (D.D.C. Feb. 13, 2006); LifePoint Hospitals, Inc. v. Leavitt, No. 05-2224 (JR) (D.D.C. filed Nov. 16, 2005).  In the Cookeville case, the government has filed a Rule 59(e) motion to alter judgment, arguing that the district court should enter judgment in favor of the Secretary in light of recently enacted legislation that explicitly ratifies the Secretary's

policy at issue (and which the court earlier declared invalid); the district court has not yet ruled

on the government's Rule 59(e) motion.

## 8.    The Deficit Reduction Act of 2005

In the Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat. 4 (2006) ("the

DRA"), Congress clarified the scope of HHS's authority with regard to the counting of section

1115 expansion population days in the numerator of the Medicaid fraction of the Medicare DSH

calculation.  Section 5002 of the DRA states:

> SEC. 5002. CLARIFICATION OF DETERMINATION OF MEDICAID PATIENT
> DAYS FOR DSH COMPUTATION.
>
> (a) IN GENERAL- Section 1886(d)(5)(F)(vi) of the Social Security Act (42 U.S.C.
> 1395ww(d)(5)(F)(vi)) is amended by adding after and below subclause (II) the following:
>
> > 'In determining under subclause (II) the number of the hospital's patient days for
> > such period which consist of patients who (for such days) were eligible for
> > medical assistance under a State plan approved under title XIX, the Secretary
> > may, to the extent and for the period the Secretary determines appropriate, include
> > patient days of patients not so eligible but who are regarded as such because they
> > receive benefits under a demonstration project approved under title XI.'

Id.  As the title of this provision indicates, this amendment to the Medicare DSH statute clarifies

that the Secretary has the authority to include or exclude expansion populations days in

determining the numerator of the Medicaid fraction of the Medicare DSH calculation.

Moreover, in language that is fatal to the plaintiffs' claims in this case, Congress

expressly ratified the HHS policy applicable prior to January 20, 2000.  Section 5002(b) of the

DRA states:

> (b) RATIFICATION AND PROSPECTIVE APPLICATION OF PREVIOUS
> REGULATIONS-

(1) IN GENERAL- Subject to paragraph (2), regulations described in paragraph (3), insofar as such regulations provide for the treatment of individuals eligible for medical assistance under a demonstration project approved under title XI of the Social Security Act under section 1886(d)(5)(F)(vi) of such Act, are hereby ratified, effective as of the date of their respective promulgations.

. . .

(3) REGULATIONS DESCRIBED- For purposes of paragraph (1), the regulations described in this paragraph are as follows:

(A) 2000 REGULATION- Regulations promulgated on January 20, 2000, at 65 Federal Register 3136 et seq., including the policy in such regulations regarding discharges occurring prior to January 20, 2000.

(B) 2003 REGULATION- Regulations promulgated on August 1, 2003, at 68 Federal Register 45345 et seq.

(Emphasis added.)

### B.    Factual Background

Plaintiffs are 24 hospitals located in the state of Tennessee who seek additional reimbursement from the Medicare program for a total of 110 fiscal years between 1994 and January 20, 2000. Rather than bring these claims through the statutorily provided appeals process, plaintiffs slept on their rights and now ask this Court to issue a writ of mandamus directing the Secretary and/or his intermediaries to, among other things, "reopen the Hospitals' cost reports pursuant to 42 C.F.R. § 405.1885(b) for all of the time periods referenced in the Hospitals' complaint." Complaint at 39. Not only have plaintiffs failed to timely appeal these claims (i.e., they did not file administrative appeals with the PRRB within 180 days of receiving NPRs), they apparently have never asked the Secretary to reopen their cost reports to reexamine their claims. Rather, plaintiffs argue that the January 20, 2000 Interim Final Rule constituted a notice of inconsistency triggering a mandatory duty to reopen. Complaint ¶¶ 61, 178. In light of

-14-

Congress's ratification of the Secretary's policies regarding section 1115 expansion population

days and DSH payments, such an argument cannot withstand legal scrutiny.

## LEGAL OVERVIEW

The "remedy of mandamus is a drastic one, to be invoked only in extraordinary

circumstances," Power v. Barnhart, 292 F.3d 781, 784 (D.C. Cir. 2002) (citation omitted), where

the "right to issuance of the writ is clear and indisputable." Id. (citations omitted); see also

Thirteenth Reg'l Corp. v. Dep't of Interior, 654 F.2d 758, 760 (D.C. Cir. 1980) (mandamus is

reserved for only the "clearest and most compelling cases") (citation omitted). To qualify for

mandamus relief, a plaintiff must first show that "he has exhausted all other avenues of relief,"

Ringer, 466 U.S. at 616, including all possible "administrative" and "judicial" remedies. Power

292 F.3d at 786. The plaintiff must then demonstrate that "the defendant owes him a clear

nondiscretionary duty," Ringer, 466 U.S. at 616, that is "so plainly prescribed as to be free from

doubt and equivalent to a positive command." Consol. Edison Co. of New York, Inc. v.

Ashcroft, 286 F.3d 600, 605 (D.C. Cir. 2002) (quoting Wilbur v. United States ex rel. Kadrie,

281 U.S. 206, 218-19 (1930)). Finally, even where exhaustion and a clear duty are shown, a

court may decline to grant mandamus relief entirely on equitable grounds. Thirteenth Reg'l

Corp., 654 F.2d at 763.

The Supreme Court has never ruled on whether mandamus may ever be invoked to

compel agency action under the Medicare statutes. See Your Home, 525 U.S. at 457 n.3; Ringer,

466 U.S. at 616. However, the Court has made clear that mandamus is not a substitute remedy

for parties who have overlooked less drastic means of getting the result they desire from the

federal government. Cheney v. U.S. Dist. Ct., 524 U.S. 367, 379 (2004); see also Haneke v.

-15-

HEW, 535 F.2d 1291, 1296 n.15 (D.C. Cir. 1976) (courts "have no general supervisory powers over the executive branches or over their officers, which may be invoked by writ of mandamus") (emphasis added).  A hospital therefore cannot invoke mandamus to vindicate a substantive claim for payment if the claim could have been pursued through the administrative and judicial processes established by Congress in 42 U.S.C. § 1395oo.  See, e.g., Ass'n of Am. Med. Colls. v. Califano, 569 F.2d 101, 111 (D.C. Cir. 1977); Lenox Hill Hosp. v. Shalala, 131 F. Supp. 2d 136, 140 (D.D.C. 2000); Nat'l Med. Enters. v. Bowen, 725 F. Supp. 1, 9 (D.D.C. 1989).

## ARGUMENT

I.    **PLAINTIFFS' MANDAMUS CLAIM SHOULD BE DISMISSED BECAUSE THE SECRETARY OWES PLAINTIFFS NO DUTY TO REOPEN FINAL PAYMENT DETERMINATIONS.**

Plaintiffs' mandamus claims should be dismissed at the outset because they have not established a "clear" and "nondiscretionary" duty to reopen, Ringer, 466 U.S. at 616, that is so "plainly prescribed as to be free from doubt and equivalent to a positive command."  Consol. Edison, 286 F.3d at 605 (quoting Kadrie, 281 U.S. at 218-19).  No such duty can be located anywhere in the language of the reopening regulation at 42 C.F.R. § 405.1885, on which plaintiffs predicate their claim.  Complaint ¶¶ 61, 178.  Plaintiffs cannot come close to meeting the high standards for mandamus relief.

A.    **The Policy and Payment Determinations At Issue Are Not Inconsistent With Applicable Law.**

In their prayer for relief set forth in the Complaint, plaintiffs request that the Court issue a writ of mandamus directing the Secretary and/or his intermediaries "to reopen the Hospitals' cost

reports pursuant to 42 C.F.R. § 405.1885(b) . . . ." Complaint at 39. The regulation cited by

plaintiffs, 42 C.F.R. § 405.1885(b) (2000), states:

> A determination or a hearing decision rendered by the intermediary shall be reopened and revised by the intermediary if, within the aforementioned three-year period, [CMS] notifies the intermediary that such determination is inconsistent with applicable law, regulations, or general instructions . . . .

Under the current language of the regulation which took effect in 2002, a notice of inconsistency

must "[e]xplicitly direct[] the intermediary to reopen and revise the intermediary's

determination," 42 C.F.R. § 405.1885(b)(1)(ii), and, in any event, "[a] change in legal

interpretation or policy by CMS," "whether made in response to judicial precedent or otherwise,

is not a basis for reopening an intermediary determination." 42 C.F. R. § 405.1885(b)(2).

Plaintiffs allege, see Complaint ¶¶ 61, 178, that the Interim Final Rule published on

January 20, 2000 – which revised HHS's policy on the treatment of section 1115 expansion

population days – constitutes notice by the Secretary that the prior policy was inconsistent with

applicable law, thus triggering a mandatory duty to reopen under 42 C.F.R. § 405.1885(b).

Plaintiffs' theory is flawed because, as Congress had made patently clear, the Secretary's prior

DSH policy regarding section 1115 days and the payment determinations applying that policy are

not legally deficient.

Hospitals have challenged the Secretary's prior policy of excluding section 1115

expansion population days from the numerator of the Medicaid fraction of the Medicare DSH

calculation. See Portland Adventist Med. Ctr. v. Thompson, 399 F.3d 1091, 1098 (9th Cir. 2005);

Cookeville Reg'l Med. Ctr. v. Thompson, 2005 WL 3276219 (D.D.C. Oct. 28, 2005), final

judgment entered (D.D.C. Feb. 2, 2006), Rule 59(e) motion to alter judgment filed (D.D.C.

-17-

Feb. 13, 2006).  In the Deficit Reduction Act of 2005 (DRA), Congress resolved any question

about the validity of the Secretary's prior policy by (1) amending the Medicare statute to clarify

that the Secretary has broad authority to include or exclude expansion population days in

determining the numerator of the Medicaid fraction of the Medicare DSH calculation, and (2)

explicitly ratifying the DSH policy applicable to discharges occurring prior to January 20, 2000.

DRA § 5002.  This legislation makes clear that the Secretary's prior policy, and the payment

determinations applying the prior policy, were not inconsistent with the applicable law.[4]

Even if the DRA had not ratified the Secretary's prior DSH policy regarding section 1115

days, plaintiffs' claim for mandamus relief would still fail because the prior policy was not

legally invalid.  Under the prior policy, HHS excluded section 1115 expansion population days

from the numerator of the Medicaid fraction of the Medicare DSH calculation.  Expansion

populations do not meet eligibility criteria for Medicaid benefits under the State plan approved

under title XIX.  In the Secretary's view, expansion populations are not "eligible for medical

assistance under a State plan approved under title XIX," and therefore the statute does not <u>require</u>

the counting of expansion population days in the numerator of the Medicaid fraction of the

Medicare DSH calculation; rather, the statute is silent concerning Title XI demonstration

projects.  The statute does not unambiguously require the inclusion of section 1115 expansion

---

[4] In <u>Portland Adventist Medical Center v. Thompson</u>, the Court of Appeals for the 9th
Circuit held that the DSH provision unambiguously required the inclusion of section 1115
expansion populations in the DSH calculation.  399 F.3d 1091, 1098 (9th Cir. 2005).  <u>Accord</u>
<u>Cookeville Reg'l Med. Ctr.  v. Thompson</u>, 2005 WL 3276219 (D. D.C. Oct. 28, 2005), final
judgment entered (D.D.C. Feb. 2, 2006), Rule 59(e) motion to alter judgment filed (D.D.C. Feb.
13, 2006).  Congress's clarification of the DSH provision explicitly ratifies the policy that the
courts declared invalid in <u>Portland Adventist</u> and <u>Cookeville</u> and makes it clear that those cases
were wrongly decided.

population days, and under the analysis of <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984), the Secretary's interpretation of an ambiguous statute is entitled to deference. The Secretary defended his prior policy in litigation <u>after</u> publication of the January 20, 2000 Interim Final Rule; accordingly, the Court should reject plaintiffs' argument that the Secretary was announcing <u>in</u> the Interim Final Rule that the prior policy was inconsistent with the applicable law.

      **B.**    **The Interim Final Rule Did Not Notify Any Intermediary that a Prior Payment Determination Was Inconsistent with Medicare Law Within the Meaning of 42 C.F.R. § 405.1885(b).**

In order to qualify for the extraordinary remedy of mandamus, plaintiffs must demonstrate that defendant owes plaintiffs a "clear nondiscretionary duty." <u>Ringer</u>, 466 U.S. at 616. Plaintiffs allege that a clear duty to reopen pursuant to 42 U.S.C. § 405.1885(b) was triggered when CMS issued the Interim Final Rule in January 2000. There is no basis for plaintiffs' view, Complaint at ¶ 61, that the Interim Final Rule clearly and unambiguously "served as notice" to any intermediary that any "prior determinations" of total program reimbursement were "inconsistent with the applicable law, regulations, or general instructions" issued by CMS. 42 C.F.R. § 405.1885(b) (2001). Nothing in the Interim Final Rule constitutes a "notice" of inconsistency, much less a notice of inconsistency that is so clear and unequivocal that it would require a writ of mandamus to issue.

In the January 20, 2000 Interim Final Rule, HHS revised (prospectively) its longstanding policy on the treatment of section 1115 expansion population days for purposes of Medicare DSH. 65 Fed. Reg. 3136 (Jan. 20, 2000). The revised policy was effective for discharges occurring on or after January 20, 2000. <u>Id.</u> The Interim Final Rule, however, says nothing about

the validity of HHS's prior policy.  The Interim Final Rule states only that including section 1115 expansion population days in the numerator of the Medicaid fraction of the Medicare DSH calculation was "consistent" with the intent of Congress.  Id. at 3137.  It does not follow from this statement that the Secretary was announcing that the prior policy was inconsistent with congressional intent.  Prior to the enactment of the DRA, the DSH statute was silent concerning Title IX demonstration projects – it neither required nor prohibited the counting of expansion population days in the numerator of the Medicaid fraction.  To the extent that the statute was ambiguous with respect to the treatment of section 1115 expansion population days, a policy of excluding the days and a policy of including the days can both be "consistent" with the statute.

The Interim Final Rule does not notify intermediaries in clear and unambiguous terms (or in any terms) that the prior policy conflicted with Medicare law "as CMS understood those legal provisions" at the time the determination was rendered by the intermediary.  42 C.F.R. § 405.1885(b)(1)(i).  And the Interim Final Rule certainly does not "direct an intermediary to reopen" previous payment determinations.  42 C.F.R. § 405.1885(e).  Nothing in the Interim Final Rule indicates that the Secretary was trying to notify intermediaries that the prior policy of excluding section 1115 expansion population days was inconsistent with the applicable law in any judicial circuit – in fact, at the time HHS published the Interim Final Rule, no court had addressed the validity of the Secretary's prior policy.  Nor does the Interim Final Rule indicate that the prior policy was inconsistent with a permissible construction of Medicare law in any other sense.

Under plaintiffs' theory, the mere fact that the Secretary implemented a change in policy constitutes an admission and notice that the prior policy was invalid.  This is patently erroneous.

-20-

The change in the Secretary's position merely reflects the propositions that "[a]n initial agency interpretation is not instantly carved in stone," <u>Rust v. Sullivan</u>, 500 U.S. 173, 186 (1991) (quoting <u>Chevron</u>, 467 U.S. at 863-64), that the agency can review "the wisdom of its policy on a continuing basis," <u>id</u>. (quoting <u>Chevron</u>, 467 U.S. at 863-64), and that, when an agency undertakes such a review, "the resolution of ambiguity in a statutory text is often more a question of policy than of law." <u>Pauley v. BethEnergy Mines, Inc.</u>, 501 U.S. 680, 696 (1991) (citing Cass R. Sunstein, <u>Law and Administration after Chevron</u>, 90 Colum. L. Rev. 2071, 2085-88 (1990)). Plaintiffs have not shown that a clear and non-discretionary duty to reopen was created by the January 20, 2000 change in the regulations.

The new regulation could be deemed to notify intermediaries that prior determinations were inconsistent with Medicare law only if <u>all</u> changes in regulations must be deemed to constitute such a notice. That result, in turn, is foreclosed by the decision of the Court of Appeals for this Circuit in <u>Monmouth</u>. In that case, a Medicare regulation had been struck down by four circuits. 257 F.3d at 810-11. The Secretary then issued an administrative ruling, known as Ruling 97-2, that stated that the regulation was "contrary to the applicable law in four judicial circuits," 257 F.3d at 813, and instructed intermediaries not to follow it any more. The Court held that this language constituted a notice of inconsistency for two carefully explained reasons, neither of which applies to this case.

First, the Court reasoned that, although Ruling 97-2 "studiously avoided using the magic words 'inconsistent with the applicable law,'" the Ruling's description of the regulation as being "contrary to the applicable law in four judicial circuits" was tantamount to a notice of inconsistency. <u>Id</u>. at 814-15. Second, the Court buttressed its analysis by emphasizing that the

-21-

statutory interpretation changed by the ruling was embodied in a formal <u>regulation</u>, rather than a mere informal instruction.  Because a regulation cannot be repealed without notice-and-comment rulemaking,[5] the Court reasoned that Ruling 97-2 "would therefore be unlawful absent notice and comment rulemaking, unless the original interpretation was itself invalid."  <u>Id.</u> at 814 (citing <u>Dixon v. United States</u>, 384 U.S. 68, 74 (1965)).  On that basis, the Court construed Ruling 97-2 as effectively notifying intermediaries that the Medicare regulation which Ruling 97-2 instructed them to no longer follow had been void from its initial promulgation.  <u>Id.</u>[6]

Neither rationale for reopening is present in this case however.  First, as stated earlier, nothing in the Interim Final Rule indicates that the Secretary was trying to notify intermediaries that the prior policy of excluding section 1115 expansion population days was inconsistent with the applicable law in any judicial circuit – in fact, at the time HHS published the Interim Final Rule, no court had addressed the validity of the Secretary's prior policy.  Thus, this case is fundamentally distinguishable from <u>Monmouth</u> because the relevant document here – the Interim Final Rule – makes no reference to adverse circuit court decisions.  The second fundamental way in which this case is distinguishable from <u>Monmouth</u> is that here, the change in policy was implemented via rulemaking.  In <u>Monmouth</u>, the Court reasoned that, because the Secretary changed the policy at issue in that case without rulemaking, the Secretary effectively notified intermediaries that the prior policy was void.  <u>Id.</u> at 814.  In this case, however, the Secretary did

---

[5] <u>See</u> <u>Air Transp. Ass'n of America, Inc. v. FAA</u>, 291 F.3d 49, 56 (D.C. Cir. 2002).

[6] In <u>Bartlett Memorial Medical Center v. Thompson</u>, 347 F.3d 828 (10th Cir. 2003), the Tenth Circuit looked at the same facts and concluded that it was Ruling 97-2, not the regulation, that was rendered a nullity by the Secretary's failure to promulgate it with notice and comment. <u>Id.</u> at 838-40.

undertake rulemaking.  Accordingly, applying the reasoning of <u>Monmouth</u> to this case, the

Secretary did not effectively or otherwise notify intermediaries that the prior policy was

inconsistent with the applicable law.

## II.    MANDAMUS RELIEF SHOULD BE DENIED ON EQUITABLE GROUNDS.

Even if plaintiffs' complaint could survive to this point, mandamus relief should be

denied on equitable grounds.  To the extent that plaintiffs are claiming a right to mandamus relief

based on 42 C.F.R. § 405.1885(b), they had all the information they needed to bring the claim in

January of 2000 (at the latest), when the Interim Final Rule was issued.  They have no excuse for

waiting until now to seek relief.  <u>See</u> <u>Thirteenth Reg'l Corp.</u>, 654 F.2d at 763 (four-year delay

sufficient to defeat mandamus relief to which plaintiff was otherwise entitled).  Claims more than

six years stale are also time barred under 28 U.S.C. § 2401(a).  Plaintiffs should not be rewarded

for sleeping on their rights.

## **CONCLUSION**

For the reasons stated, defendant's motion to dismiss should be granted.

Respectfully submitted,

_____/s/_____

KENNETH L. WAINSTEIN
United States Attorney
D.C. Bar No. 451058

_____/s/_____

PETER S. SMITH
Assistant United States Attorney
D.C. Bar No. 465131
Civil Division
555 4th Street, N.W.
Washington, D.C.  20530
(202) 307-0372/FAX: (202) 514-8780


DAVID HOSKINS
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
330 Independence Ave., S.W., Room 5309
Washington, D.C. 20201

Attorneys for Defendant,
Michael O. Leavitt,
Secretary of Health and Human Services

OF COUNSEL:
PAULA M. STANNARD
Acting General Counsel

KATHLEEN H. MCGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation
United States Department of Health
and Human Services

-24-