# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

_____
)
BH1, et al.,                                   )
                                               )
      Plaintiffs                         )
      v.                                 )
                                               )    Case No.: 1:06-cv-00070 (JR)
MICHAEL O. LEAVITT,                            )
Secretary, United States Department of         )
Health And Human Services                      )
                                               )
      Defendant                          )
_____)

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................1

I.     The Medicare Payment System .........................................................................1

II.    The Medicare DSH Adjustment...........................................................................2

III.   State Plans Of Medical Assistance Under Title XIX ...........................................3

IV.    Demonstration Projects.....................................................................................4

V.     The Secretary's Notice of Inconsistency ...........................................................5

VI.    The Hospitals in This Case ...............................................................................7

VII.   The Deficit Reduction Act ................................................................................7

LEGAL ARGUMENT...............................................................................................9

I.     A Writ Of Mandamus Must Be Issued Because The Secretary, By Way Of The Interim
       Final Rule, Provided A Notice Of Inconsistency Requiring A Mandatory Reopening Of
       Past Cost Report Years Pursuant To 42 C.F.R. § 405.1885(b)...........................................9

II.    The Secretary's Arguments Are Incorrect .......................................................13

       A.     The Amended Version Of The Reopening Regulation, 42 C.F.R. § 1885(b), Does
              Not Apply To The Present Matter ......................................................13

       B.     The Prior Policy Of Excluding 1115 Days Was Unlawful ...................................14

       C.     The Interim Final Rule Constitutes A Notice Of Inconsistency ...........................16

       D.     The Deficit Reduction Act Does Not Apply To This Case And Does Not Make
              The Secretary's Past Payment Determinations "Consistent" With Applicable
              Law ...............................................................................................19

              1.     The DRA Amendment Is Not A "Clarification" Of Existing Law, But
                     Rather A Change In The Law That Cannot Be Applied Retroactively .....20

                     a.     Because The Law Prior To The Amendment Was Unambiguous,
                            The Amendment Constitutes A Change In The Law....................20

b.      The <u>Loving v. United States</u> Line Of Cases Do Not Support The Secretary's Argument ....................................................................22

c.      The Secretary's Likely Reliance Upon <u>Beverly v. Shalala</u> is Misplaced..........................................................................................26

d.      The Use Of The Word "Clarification" In The DRA Amendment Is Not Determinative..........................................................................28

e.      The Change In Law Set Forth At Section 5002(a) Of The DRA Cannot Be Applied Retroactively ..................................................30

2.      The Amendment's Purported "Ratification" Of The Secretary's Regulations Is Not, As The Secretary Asserts, Fatal To The Hospitals' Claims In This Matter ...............................................................................34

a.      Ratification Does Not Apply In This Case Because The Elements Of Ratification Have Not Been Satisfied......................................34

b.      Ratification Of The Secretary's Regulations, Even If Otherwise Applicable, Would Not Result In The Dismissal Of The Hospitals' Claims Against The Secretary .......................................................35

c.      The DRA Amendment Does Not Purport To Be Retroactive To The Hospitals And Cost Report Periods At Issue In This Litigation..................................................................................................38

d.      The Act Does Not Purport To Ratify The Exclusion Of Expansion Populations From The DSH Calculation ......................................39

CONCLUSION……..................................................................................................................40

# TABLE OF AUTHORITIES

*Case:*                                                                          *Page(s):*

Alhambra Hosp. v. Thompson,
      259 F.3d 1071 (9th Cir. 2001) ..........................................................................28

Am. Fed'n of Gov't Employees v. District of Columbia Fin. Responsibility and Mgmt.
      Assistance Auth.,
      133 F. Supp. 2d 75 (D.D.C. 2001) ...................................................................37

Beverly v. Shalala,
      132 F.3d 1259 (9th Cir. 1997) ..................................................................26, 27

Bowen v. Georgetown Univ. Hosp.,
      488 U.S. 204 (1988)...................................................................................30, 32

Brown v. Secretary of the Army,
      78 F.3d 645 (D.C. Cir. 1996) ..........................................................................21

Cabell Huntington Hosp., Inc. v. Shalala,
      97 F.3d 984 (4th Cir. 1996) ......................................................................10, 28

Cookeville Reg'l Med. Ctr. v. Thompson,
      No. Civ.A. 04-1053 JR, 2005 WL 3276219 (D.D.C. Oct. 28, 2005) ....................... *passim*

Deaconess Health Servs. Corp. v. Shalala,
      83 F.3d 1041 (8th Cir. 1996) ....................................................................10, 28

Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.,
      99 F. Supp. 2d 1123 (E.D. Cal. 2000).......................................................28, 29

Equal Employment Opportunity Comm'n v. Merrill Lynch,
      677 F. Supp. 918 (N.D. Illinois 1987) ...............................................................37

In Re: Medicare Reimbursement Litig.,
      309 F.Supp. 2d 89 n.6 (D.D.C. 2004), aff'd, 414 F.3d 7 (D.C. Cir. 2005), cert. denied,
      126S.Ct. 1672 (2006) ................................................................................ *passim*

INS v. St. Cyr,
      533 U.S. 289 (2001)..........................................................................................31

Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.,
      19 F.3d 270 (6th Cir. 1994) ......................................................................10, 28

Landgraf v. USI Film Products,
    511 U.S. 244 (1994)......................................................................................21, 33, 34

Legacy Emanuel Hosp. & Health Ctr. v. Shalala,
    97 F.3d 1261 (9th Cir. 1996) ...................................................................10, 28

Loving v. United States,
    517 U.S. 748 (1996)......................................................................................22

McCreary v. Offner,
    1 F. Supp. 2d 32 (D.D.C.  1998), aff'd, 172 F.3d 76 (D.C. Cir. 1999).............................21

Monmouth Med. Ctr. v. Thompson,
    257 F.3d 807 (D.C. Cir. 2001) ...........................................................10, 17, 28

Paramount Health Sys. v. Wright,
    138 F. 3d 706 (7th Cir. 1998) ........................................................24, 25, 26, 27

Portland Adventist Med. Ctr. v. Thompson,
    399 F.3d 1091 (9th Cir. 2005) .............................................................. passim

Pottgieser v. Kizer,
    906 F.2d 1319 (9th Cir. 1990) ................................................................3

Rivers v. Roadway Express,
    511 U.S. 298 (1994)......................................................................................30, 31, 32

Thomas v. Network Solutions,
    No. 97-2412 TFH, 1998 WL 1738180 (D.D.C. 1998), aff'd, 176 F. 3d 500 (D.C.
    Cir. 1999) .......................................................................................34, 35, 37

United States v. Hercules,
    929 F. Supp. 1418 (D. Utah 1996)......................................................................................21

United States v. Montgomery County,
    761 F.2d 998 (4th Cir. 1985) ...........................................................21

United States v. Ruiz-Batista,
    956 F.2d 351 (1st Cir. 1992)......................................................................................21

United States v. Schooner Peggy,
    5 U.S. (1 Cranch) 103 (1801)......................................................................................33

United States ex rel. Long v. SCS Bus. and Technical Inst.,
    173 F.3d 870 (D.C. Cir. 1999) ...........................................................23

Usery v. Turner Elkhorn Mining Co.,
    428 U.S. 1 (1976).................................................................................21


*Statutes, Regulations, and Other Authorities*:                *Page(s)*:


42 U.S.C. § 1315................................................................................5
    § 1315(a).............................................................................4
    §§ 1315(a)(1), 1315(a)(2)(A).........................................................4
    § 1395f(b)(1).......................................................................1
    § 1395oo(a).........................................................................2
    § 1395 ww(d).......................................................................1
    § 1395ww(d)(5)(F)...............................................................24
    § 1395ww(d)(5)(F)(vi)(II).........................................................3
    § 1396.................................................................................3
    §§ 1396a(a)(10)(A), 1396(a)(1)..................................................3
    § 1396d...............................................................................3
    § 1396d(a)...........................................................................4


Deficit Reduction Act, 120 Stat. 4, Pub. L. No. 109-171 § 5002 (2006) ...........8
    § 5002(a)...........................................................38
    § 5002(b)(1) ......................................................38
    §5002(b)(2)(3)....................................................39


42 C.F.R. § 405.1803..........................................................................2
    § 405.1885(b)......................................................................2
    §§ 405.1885(b),(d)...............................................................2
    § 412.106...........................................................................36
    § 412.106(b)(4)(ii) ...............................................................38
    §§ 413.20(b), 413.24(f) ..........................................................2


65 Fed. Reg. 3136 (Jan. 20, 2000) ...............................................5, 6, 18, 38


65 Fed. Reg. 47,054 (Aug. 1, 2002)...................................................5


65 Fed. Reg. 49982-01, 50096-98 ....................................................13


67 Fed. Reg. 50,096 (Aug. 1, 2002)................................................2, 13

## PRELIMINARY STATEMENT

The Secretary's motion to dismiss presupposes that this Court will reverse itself in the matter of Cookeville Regional Medical Center v. Thompson, No. Civ.A. 04-1053 JR, 2005 WL 3276219 (D.D.C. Oct. 28, 2002). The Secretary filed a Motion to Alter Judgment in the Cookeville case that is currently pending before this Court. Based on the arguments made by the plaintiffs in the Cookeville case, the Court's decision in that matter should not be reversed. Once the Secretary's motion in Cookeville is denied, the Secretary's Motion to Dismiss in the present matter must be denied as well, for the reasons set forth below.

## STATEMENT OF FACTS

### I.    The Medicare Payment System

Congress enacted the Medicare program (Title XVIII of the Social Security Act) in 1965. As originally enacted, Medicare was a health insurance program that furnished health benefits to participating individuals once they reached the age of 65. For cost reporting years beginning before October 1, 1983, the Medicare program reimbursed hospital services on a "reasonable cost" basis. 42 U.S.C. § 1395f(b)(1). In 1983, Medicare began reimbursing hospitals using the prospective payments system ("PPS"). 42 U.S.C. § 1395ww(d). Under PPS, hospitals are paid a fixed amount for each of approximately 490 diagnosis-related groups ("DRGs"), subject to certain payment adjustments.

The Secretary (or one or more of his predecessors, hereinafter collectively referred to simply as "the Secretary") has delegated much of the responsibility for administering the Medicare Program to the Centers for Medicare and Medicaid Services ("CMS"). The Secretary, through CMS, contracted out many of Medicare's audit and payment functions to entities known as fiscal intermediaries.

In order for a hospital to obtain Medicare reimbursement, it must, at the close of each fiscal year, submit to its intermediary a "cost report" showing both the costs incurred by it during the fiscal year and the appropriate share of those costs to be apportioned to Medicare. 42 C.F.R. §§ 413.20(b), 413.24(f). The intermediary then audits the cost report and informs the hospital of its final determination of the amount of Medicare reimbursement through a notice of program reimbursement ("NPR"). 42 C.F.R. § 405.1803. A provider dissatisfied with its intermediary's determination may file an appeal with the Provider Reimbursement Review Board ("PRRB" or "Board") within 180 days of the date of the NPR. 42 U.S.C. § 1395oo(a).

In addition to filing an appeal, a provider may, in certain circumstances, obtain relief through an intermediary's reopening of its cost report, without the involvement of the PRRB. For example, under 42 C.F.R. § 405.1885(b), an NPR "must be reopened and revised by the intermediary if . . . the Centers for Medicare & Medicaid Services notifies the intermediary that such determination or decision is inconsistent with the applicable law, regulations, or general instructions issued by the Centers for Medicare & Medicaid Services." See 67 Fed. Reg. 50,096 (Aug. 1, 2002) (citation omitted). This type of mandatory reopening, under subsection 405.1885(b), is the subject of the present litigation.[1]

## II.    The Medicare DSH Adjustment

Hospitals that serve a disproportionate share of low-income patients, as the Hospitals in this matter do, are eligible for upward adjustments to their Medicare PPS payments. The Secretary has delegated to CMS the authority to calculate and pay DSH adjustments as part of the PPS reimbursement system. CMS, in turn, delegates the responsibility to the fiscal

---

[1] Subsections 405.1885(a) and (d) allow for a reopening at the request of the hospital or based on a party's "fraud or similar fault." Neither of those subsections is at issue in the present case.

intermediaries who notify hospitals of their DSH adjustments on their NPR's. The intermediaries calculate the DSH adjustment by adding two fractions known as the Medicare Proxy and the Medicaid Proxy.[2]   It includes, among other things, the categories of "patient days" that should be included in the DSH calculation for those patients who were eligible for medical assistance under a State plan approved under Title XIX:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter, but who were not entitled to benefits under Part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).   A larger number of patients in the numerator of the Medicaid proxy means a larger DSH adjustment for the Hospital.

## III.    State Plans of Medical Assistance Under Title XIX

 The Medicaid program, set forth in Title XIX of the Social Security Act, is a cooperative federal-state program that furnishes health care to persons who meet specified eligibility requirements, including low-income status.  See 42 U.S.C. § 1396; Pottgieser v. Kizer, 906 F.2d 1319, 1321 (9th Cir. 1990).  States participating in Medicaid have a substantial amount of discretion in selecting the benefits provided under their Medicaid programs.  42 U.S.C. § 1396d. Nevertheless, all participating states must furnish certain benefits, including inpatient hospital services.  42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(1).

States that participate in the Medicaid program are required to develop a State Plan for delivery of medical assistance, and to submit that Plan to the Secretary for approval.  42 U.S.C. §

---

[2] This case does not involve the Medicare proxy but is about the Medicaid proxy only.

1396.  The Plan must comply with certain requirements of the Medicaid statute set forth in 42

U.S.C. § 1396a.

## IV.    Demonstration Projects

A Federal statute, namely Section 1115 of Title XI of the Social Security Act, authorizes

the Secretary to waive certain Medicaid requirements in order to encourage states to create

innovative programs that are "likely to assist in promoting the objectives of . . . [Title] XIX…."

42 U.S.C. § 1315(a).  The stated objective of Title XIX is to provide medical assistance to

individuals "whose income and resources are insufficient to meet [certain health care costs

including inpatient hospital services]." 42 U.S.C. § 1396d(a).  In order to foster the development

of demonstration projects, also known as waiver programs,  Section 1115 allows the Secretary to

waive compliance with certain of the requirements for Medicaid State Plans set out in 42 U.S.C.

§ 1396a.  The costs associated with demonstration projects under Section 1115 are statutorily

deemed to be expenditures under an approved Title XIX State Plan.  See  42 U.S.C.  §§

1315(a)(1), 1315(a)(2)(A).  Section 1115 provides in relevant part:

> (1) [T]he Secretary may waive compliance with any of the
> requirements of section . . . 1396a . . . to the extent and for the
> period he finds necessary to enable such State or States to carry out
> such project, and
> (2)(A) costs of such project which would not otherwise be included
> as expenditures under . . . 1396b . . . shall, to the extent and for the
> period prescribed by the Secretary, be regarded as expenditures
> under the State plan or plans approved under such subchapter, or
> for administration of such State plan or plans, as may be
> appropriate . . . .

42 U.S.C. §§ 1315(a)(1), 1315(a)(2)(A).

In some cases, a waiver program covers patients who otherwise could have been made

eligible for Medicaid under the State Plan requirements set forth in 42 U.S.C. § 1396a.  In other

cases, waiver programs may provide for medical assistance to expanded eligibility populations of

low income individuals who would not be eligible for Medicaid in the absence of a waiver. See 42 U.S.C. § 1315. As noted in the introduction, the patient days of service associated with these expansion populations, made eligible through a waiver, are referred to as "waiver days."

Tennessee has operated an approved Section 1115 waiver program, known as TennCare, since January of 1994. TennCare covers, among others, individuals who are not eligible for traditional Medicaid and who are uninsurable or do not have access to employer-sponsored healthcare.[3] Thus, the TennCare program affords health care benefits to expansion populations and has covered such patients ever since the program's inception.[4]

The Secretary, from 1994 until January 2000, interpreted the Medicare statute as excluding waiver days from the Medicaid proxy of the DSH calculation. The Secretary issued various policy statements and memoranda prohibiting providers from claiming, and intermediaries from counting, waiver days in the DSH calculation.

## V.    The Secretary's Notice of Inconsistency

In January of 2000, the Secretary issued an interim final rule wherein he changed his position so as to include waiver days in the DSH calculation. See Interim Final Rule, 65 Fed. Reg. 3136 (Jan. 20, 2000).[5] In the Interim Final Rule, the Secretary noted that "[o]ne purpose of a section 1115 expansion waiver is to extend Title XIX matching payments to services furnished to populations that otherwise could not have been made eligible for Medicaid," and that section 1115(a)(2)(A) "allows for the expansion populations to be treated as Medicaid beneficiaries." Id. at 3137.

---

[3] See Cookeville, 2005 WL 3276219, at *3.

[4] Id.

[5] The interim final rule was adopted as the final rule on August 1, 2000. See Final Rule, 65 Fed. Reg. 47,054 (Aug. 1, 2000).

The Secretary declared, in both the Interim Final Rule and the commentary that accompanied it, that waiver days would be included in the DSH calculation prospectively, beginning with patient discharges on January 20, 2000. Id. at 3136-37. The Secretary stated that he was "revising the policy, effective with [patient] discharges occurring on or after January 20, 2000, to allow hospitals to include the patient days of all populations eligible for Title XIX matching payments in a State's Section 1115 waiver in calculating the hospital's Medicare DSH adjustment." Id. The Secretary stated that he made this change so that the intermediaries' calculation of the Medicare DSH adjustment would be "fully consistent" with the Medicare statute. Id. at 3137.

The Secretary, by providing notice to his intermediaries that they must include waiver days in the DSH calculation in order to be "fully consistent" with the Medicare statute, effectively provided notice to the intermediaries that their prior determinations, which excluded waiver days under a policy that was exactly the opposite of the Interim Final Rule, were inconsistent with the statute. In other words, the Interim Final Rule, and the commentary accompanying it, constituted a notice of inconsistency under 42 C.F.R. § 405.1885(b). Pursuant to that regulation, the Secretary had a mandatory, non-discretionary duty to reopen all of the NPR's issued during the three years prior to January 20, 2000 and to correct those determinations so as to include waiver days in the DSH calculation. The Secretary, however, did not issue any reopenings or corrected NPR's to include waiver days in the DSH calculation as required by the reopening regulation.

The fact that the intermediaries issued determinations that were inconsistent with the Medicare statute (with respect to patient discharges prior to January 20, 2000) cannot be disputed. Courts that have considered the issue, including this one, have held that waiver days

must be included in the calculation and that the policy of exclusion violated the federal statutes.

See Cookeville, 2005 WL 3276219, at *9 (granting summary judgment); Portland Adventist

Med. Ctr., et al. v. Thompson, 399 F.3d 1091, 1099 (9th Cir. 2005) (affirming District Court's

grant of summary judgment).

## VI. The Hospitals in This Case

The Hospitals in the present matter are comprised of twenty-four acute care hospitals.

Each Hospital is a licensed Medicare and Medicaid provider that provided care to indigent

patients eligible for Tennessee's section 1115 waiver program.  For each of the cost report years

at issue in this case (which are set forth in the Hospitals' Complaint), the Hospitals were either

eligible for a DSH adjustment or would have been eligible to receive a DSH adjustment if the

Secretary had properly included waiver days in the DSH calculation.

The Interim Final Rule constituted a notice of inconsistency for purposes of the

Secretary's reopening regulation, 42 C.F.R. § 405.1885(b), and required the reopening of all cost

reports issued to the Hospitals in the three years prior to the publication of the interim final rule.

Accordingly, the Secretary must reopen all NPR's that the intermediaries issued to the Hospitals

between January 20, 1997 and January 20, 2000, and recalculate the DSH adjustment so as to

include waiver days.

## VII. The Deficit Reduction Act

On February 8, 2006, while the instant lawsuit was pending, the Deficit Reduction Act of

2005 (the "Act" or the "DRA") was signed into law by the President of the United States.[6]

Section 5002 of the Act (the "Amendment") states the following:

---

[6] The Hospitals contend that the Act is constitutionally invalid because the version of the Act
signed by the President of the United States never passed the House of Representatives.

### Sec. 5002. CLARIFICATION OF DETERMINATION OF MEDICAID PATIENT DAYS FOR DSH COMPUTATION.

(a) IN GENERAL.-Section 1886(d)(5)(F)(vi) of the Social Security Act (42 U.S.C. 1395ww(d)(5)(F)(vi)) is amended by adding after and below subclause (II) the following:

"In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI."

(b) RATIFICATION AND PROSPECTIVE APPLICATION OF PREVIOUS REGULATIONS.-

(1) IN GENERAL.-Subject to paragraph (2), regulations described in paragraph (3), insofar as such regulations provide for the treatment of individuals eligible for medical assistance under a demonstration project approved under title XI of the Social Security Act under section 1886(d)(5)(F)(vi) of such Act, are hereby ratified, effective as of the date of their respective promulgations.

(2) NO APPLICATION TO CLOSED COST REPORTS.-Paragraph (1) shall not be applied in a manner that requires the reopening of any cost reports which are closed as of the date of the enactment of this Act.

(3) REGULATIONS DESCRIBED.-For purposes of paragraph (1), the regulations described in this paragraph are as follows:

(A) 2000 REGULATION.-Regulations promulgated on January 20, 2000, at 65 Federal Register 3136 et seq., including the policy in such regulations regarding discharges occurring prior to January 20, 2000.

(B) 2003 REGULATION.-Regulations promulgated on August 1, 2003, at 68 Federal Register 45345 et seq.

DRA, Pub. L. No. 109-171, 120 Stat. 4 (2006).

As explained in the legal argument that follows, the Amendment cannot be applied to the Hospitals' lawsuit against the Secretary in the instant matter, and the Secretary's reliance upon the Amendment in support of his motion to dismiss is misplaced. Furthermore, all of the issues relative to the DRA are presently being litigated in the Cookeville matter currently pending before this Court. The DRA issues have been completely briefed in that matter. It is

anticipated that the holding in <u>Cookeville</u> would apply with equal force to the present matter, because the issues are identical.

## LEGAL ARGUMENT

I.     **A Writ Of Mandamus Must Be Issued Because The Secretary, By Way Of The Interim Final Rule, Provided A Notice of Inconsistency Requiring A Mandatory Reopening Of Past Cost Report Years Pursuant To 42 C.F.R. § 405.1885(b).**

A writ of mandamus compels an officer or employee of the United States or any federal agency to perform a non-discretionary duty owed to the plaintiffs.  <u>See</u>  28 U.S.C. §1361.  In order to obtain a writ of mandamus, a plaintiff must possess a clear right to relief, the government actor must have had a clear duty to act, and there can be no other adequate remedy available to the plaintiff.  <u>See</u> <u>In Re: Medicare Reimbursement Litig.</u>, 414 F. 3d 7, 10 (D.C. Cir. 2005), <u>cert. den.</u>, 126 S.Ct. 1672 (2006).

The mandatory, non-discretionary duty at the center of this case is the duty of the Secretary and the intermediary, under 42 C.F.R. § 405.1885(b), to reopen closed cost reports when the Secretary has provided notice to the intermediary that the payment determinations for those closed cost reports, i.e. the NPR's, were inconsistent with the law.  The <u>In Re: Medicare</u> and <u>Monmouth Medical Center v. Thompson</u>, 257 F.3d 807 (D.C. Cir. 2001) cases, which are controlling in the present matter, involved the issue of whether a CMS Ruling regarding the Medicare DSH calculation constituted a "notice of inconsistency" under 42 C.F.R. § 405.1885(b).[7]  The Ruling, known as Ruling 97-2, dealt with the issue of whether intermediaries must include in the DSH calculation inpatient days of service for those patients who were

_____

[7] The Ruling was actually issued by the Health Care Finance Administration.  But, as noted in the Statement of Facts above, for purposes of consistency, the acronym of the successor agency, CMS, is used throughout this brief.

eligible for Medicaid, but for whom Medicaid had made no payment.  These patient days are known as eligible but unpaid days.  Monmouth, 257 F.3d 810.

In the early and mid-1990's, the Secretary vigorously opposed the attempted inclusion of eligible but unpaid days in the DSH calculation in a series of court cases, all of which the Secretary lost.  See Cabell Huntington Hosp., Inc. v. Shalala, 101 F.3d 984 (4th Cir. 1996); Legacy Emanuel Hosp. & Health Ctr. v. Shalala, 97 F.3d 1261 (9th Cir. 1996); Deaconess Health Servs. Corp. v. Shalala, 83 F.3d 1041 (8th Cir. 1996); Jewish Hosp., Inc. v. Sec'y of Health and Human Servs., 19 F.3d 270 (6th Cir. 1994).  Following these losses, the Secretary issued Ruling 97-2, which mandated that intermediaries include eligible but unpaid days in the Medicare DSH calculation for all unsettled cost reports, i.e. cost reports for which an NPR had yet to be issued.  See Monmouth, 257 F.3d at 810.  Like the Interim Final Rule in the present matter, Ruling 97-2 was prospective only and did not allow intermediaries to reopen NPR's that had already been issued (those NPR's that had been issued prior to February 27, 1997).

The plaintiff hospitals, in both Monmouth and In Re: Medicare, successfully argued that Ruling 97-2 was, in fact, a "notice of inconsistency" for purposes of the Secretary's reopening regulation, 42 C.F.R. § 405.1885(b).  The plaintiff hospitals in those cases argued that the Secretary, by publishing Ruling 97-2 and requiring the prospective inclusion of unpaid days, "in effect announced a finding of inconsistency even while purporting to veto reopening." Monmouth, 257 F.3d at 813 (parentheses omitted).  The court held that the hospitals were correct, "[c]oncluding that the Secretary did in fact give notice of the [prior policy's] inconsistency with applicable law," and found that "§ 405.1885(b) imposed a clear duty on intermediaries to reopen DSH payment determinations for the hospitals."  Id. at 814.

Subsequently, the Secretary, in the <u>In Re: Medicare</u> case, argued that the hospitals should be precluded from obtaining reopenings because of an alleged failure to exhaust administrative remedies. The hospitals in <u>In Re: Medicare</u> had not filed appeals with the PRRB or reopening requests with the intermediary. This Court, and the Court of Appeals, rejected the Secretary's argument. "[G]iven that section 405.1885(b) does not require hospitals to file anything at all to obtain relief, we see no basis for holding that only those hospitals that appealed or sought section 405.1885(a) reopening have a personal right to the reopening required by section 405.1885(b)." <u>In Re: Medicare</u>, 414 F.3d at 11. The Court of Appeals further held: "Indeed, the fact that section 405.1885(b) contains no prerequisite for relief beyond a notice of inconsistency suggests that all hospitals undercompensated due to an erroneous interpretation of the law have a personal right to section 405.1885(b) reopening." <u>Id.</u> at 11-12.

In the present matter, the notice of inconsistency that triggers a mandatory reopening under section 405.1885(b) is the Interim Final Rule regarding the inclusion of waiver days. The Interim Final Rule, like Ruling 97-2 in the <u>Monmouth</u> and <u>In Re: Medicare</u> decisions, prospectively required intermediaries to include an additional category of patient days in the Medicare DSH calculation. In <u>Monmouth</u> and <u>In Re: Medicare</u>, the additional category of patient days was the eligible but unpaid Medicaid days. In the present matter, the additional category of days is waiver days.

The Court's decisions with respect to both the Interim Final Rule (in the case of waiver days) and Ruling 97-2 (in the case of eligible but unpaid days) have uniformly held that the omitted patient days were required by the Medicare statute to be included in the DSH calculation and that the Secretary had no discretion to exclude such days. Indeed, the Court of Appeals for the Ninth Circuit found the Secretary's refusal to calculate DSH properly and follow the clear

mandate of the Medicare statute, in the specific context of waiver days, could only be explained by the Secretary's traditional hostility to DSH:

> This appears to be the latest in a series of cases in which the Secretary has refused to implement the DSH provision in conformity with the intent behind the statute. In each of these cases, the court rejected the Secretary's position. The same result must follow here.

Portland Adventist, 399 F.3d at 1099 (citations omitted).

In both the present matter involving the Interim Final Rule, and in the cases dealing with Ruling 97-2, the change in reimbursement ordered by the Secretary was a correction intended to make prospective payment determinations consistent with the Medicare DSH statute. Indeed, in the instance of the Interim Final Rule, the Secretary explicitly stated that the 180 degree change in reimbursement policy now makes DSH payments "fully consistent" with the Medicare statute. See Interim Final Rule, 65 Fed. Reg. at 3137.

Based on the foregoing, it cannot be reasonably disputed that the Interim Final Rule constitutes a notice of inconsistency for purposes of section 405.1885(b). This triggers a mandatory duty on the part of the Secretary and the intermediary to reopen all NPR's issued to the Hospitals during the three year period beginning on January 20, 1997 and ending on January 20, 2000. The Hospitals respectfully request that the Secretary's Motion to Dismiss be denied.[8]

---

[8] For the same reasons, the Hospitals' pending Motion for Summary Judgment should be granted, compelling the intermediaries to accept documentation from the Hospitals regarding the excluded waiver days for the fiscal years identified in the Complaint, and to process corrected payments within 90 days of receiving the documentation.

**II.    The Secretary's Arguments Are Incorrect**

    **A.    The Amended Version Of The Reopening Regulation, 42 C.F.R. § 405.1885(b), Does Not Apply To The Present Matter.**

The Secretary argues, in his moving brief, that the Interim Final Rule does not qualify as a "notice of inconsistency" under 42 C.F.R. § 405.1885(b) because the Secretary has not "directed" the intermediary to reopen the NPR's that are at issue in the Complaint. The Secretary, however, is relying on a version of 42 C.F.R. § 405.1885(b) that was not in effect during the relevant time periods. The requirement that the Secretary "explicitly direct" the intermediary to reopen did not become part of 42 C.F.R. § 405.1885(b) until 2002. An examination of the Federal Register reveals that the Secretary did not even propose the regulatory amendment adding the "explicitly direct" requirement until May 1, 2002 and did not promulgate the amendment as a final rule until August 1, 2002. Last and most important, the Final Rule did not become effective, pursuant to its own terms, until October 1, 2002. See 67 Fed. Reg. 49982-01, 50096-98 (Aug. 1, 2002). The Interim Final Rule was issued more than two years earlier, on January 20, 2000. The Secretary's argument in the present matter presupposes that the new version of section 405.1885(b) should be retroactively applied.

Retroactive application, however, is not only foreclosed by the amended reopening regulation itself (which purports only to be effective prospectively, beginning on October 1, 2002, see 67 Fed. Reg. 49982-01), but also by the controlling decisional law. The Secretary unsuccessfully attempted to have the amended version of section 405.1885(b) apply retroactively in the context of In Re: Medicare Reimbursement Litigation, 309 F.Supp. 2d 89 n.6 (D.D.C. 2004), aff'd, 414 F.3d 7 (D.C. Cir. 2005), cert. denied, 126 S.Ct. 1672 (2006). In that case, as in the present matter, the Secretary had corrected his reimbursement policy to comport with the Medicare statute, but had foreclosed the reopening of past cost reports in order to make the

correction. The Court, in <u>In Re: Medicare</u>, rejected the Secretary's argument, holding that the

amended version of the reopening regulation did not exist when the Secretary issued Ruling 97-2

and the retroactive application of the amended reopening regulation would impair vested rights.

<u>Id.</u>

> The Court rejects defendant's assertion that the Court should apply
> the current regulation rather than the regulation in effect during the
> relevant time period. The recent amendment to Section
> 405.1885(b) requires an order from CMS to intermediaries to
> reopen and revise NPRs on the basis of a prior inconsistency with
> the applicable law. Application of this new regulation therefore
> would eliminate the right of plaintiffs to pursue their claim because
> in this instance CMS gave no such order. Retroactive application
> of the new regulation would be improper under established case
> law. <u>See</u> <u>National Mining Ass'n v. Department of Labor</u>, 292 F.3d
> 849, 859 (D.C. Cir. 2002) ("In the administrative context, a rule is
> retroactive if it takes away or impairs vested rights acquired under
> existing law, or creates a new obligation, imposes a new duty, or
> attaches a new disability in respect to transactions or
> considerations already past").

<u>Id.</u> at 97.

There can be do dispute that the version of section 405.1885(b) that existed prior to the

amendment—and which did <u>not</u> require a notice of inconsistency to direct the intermediary to

reopen—applies to the Interim Final Rule and cost report years at issue in the present matter (the

cost report years at issue are 1994 through 2000).

### B.    The Prior Policy of Excluding 1115 Days Was Unlawful.

The Secretary, in an offhand argument that is only one paragraph long, states that "[e]ven

if the DRA had not ratified the Secretary's prior DSH policy regarding section 1115 days,

plaintiffs' claim for mandamus relief would still fail because the prior policy was not legally

invalid." <u>See</u> Secretary's Brief at 18. In order for such an argument to prevail, however, the

Court of Appeals for the D.C. Circuit would first have to reverse the <u>Cookeville</u> decision.

In the Cookeville case, this Court unequivocally held that the Secretary's prior policy of excluding section 1115 waiver days from the DSH calculation was, in fact, legally "invalid" because it violated the Medicare statute.  Cookeville, 2005 WL 3276219, at *9.  In Cookeville, this Court soundly rejected the Secretary's argument regarding the supposed validity of the prior policy and held that the Secretary's policy of excluding the waiver days "contravenes clear and unambiguous statutes":

>           The plain language of the DSH and § 1115 waiver
> provisions, the statutory scheme of medical assistance under
> Medicare, and Congress's subsequent statements on the matter, lead
> me to the conclusion that the DSH formula unambiguously includes
> all patients eligible for medical assistance under Title XIX,
> regardless of the mechanism by which they become eligible.  This
> includes those patients who would not otherwise have been eligible
> for Medicaid but for the § 1115 waiver provision.  I therefore find
> that the Secretary's exclusionary method of calculating the DSH
> adjustment that was in effect before January 20, 2000 contravenes
> clear and unambiguous statutes.  Because I find that Congress has
> spoken clearly through these statutes, I do not need to address
> whether the Secretary's policy was a "permissible" interpretation of
> the statute.

Cookeville, 2005 WL 3276219, at *8.  The holding of the Ninth Circuit Court of Appeals was exactly the same, ruling that the prior policy of excluding section 1115 waiver days from the DSH calculation (for hospitals in Oregon) violated federal statutes.  Portland Adventist, 399 F.3d at 1098.  The Secretary readily admits that his argument presupposes that Cookeville and Portland Adventist were "wrongly decided."  Secretary's Brief at 18 n.4.[9]  However, because the

---

[9] The Secretary, as part of his argument, claims that the Medicare DSH statute is "silent concerning Title XI demonstration projects."  Secretary's Brief at 18.  This specific argument was raised by the Secretary in Cookeville (2005 WL at 3276219 at *4), but was unequivocally rejected by the Court, which held that the statutory scheme is "coherent and consistent" and that section 1115 waiver days are included in the DSH calculation because "the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  Id.

Cookeville and Portland Adventist cases were in fact correctly decided and have not been reversed or vacated, the Secretary's argument must be rejected.

### C.    The Interim Final Rule Constitutes a Notice of Inconsistency

The Secretary's argument that the Interim Final Rule does not constitute a notice of inconsistency under 42 C.F.R. § 405.1885(b) is similar to his argument regarding the supposed "validity" of his prior policy of excluding section 1115 waiver days.  Both arguments would require the legal landscape described by the Court in Cookeville to be completely swept away.

The Secretary states that "[n]othing in the Interim Final Rule constitutes a 'notice' of inconsistency. . . ."  See Secretary's Brief at 19.  This argument runs totally counter to the holding of this Court in Cookeville.  The Court, in Cookeville, ruled that the statutory DSH scheme that was in effect both prior to January 2000 and thereafter, did not allow for any discretion by the Secretary to include or exclude patient days from the DSH calculation once he deems a category of patient days (such as section 1115 waiver days) to be an expenditure made under Title XIX.  Id. at 6-9.  In other words, because of the nature of the statutes, the Secretary's policy was either unlawful before the Interim Final Rule, or unlawful after it, but under no circumstances could it be lawful during both time periods.  The Court ruled:

> The Secretary cannot have it both ways.  Medical assistance provided to expansion populations is either part of a state plan approved under Title XIX, or it is not.  If the medical assistance provided through demonstration projects indeed flows from a "separate [Title XI] expenditure authority," as the Secretary maintained, it would contravene the statute to include expansion populations in the DSH formula no less than it would to exclude them if such assistance flows from Title XIX, as plaintiffs claim.  Thus, the only way the Secretary's pre-2000 exclusionary policy could have been lawful is if his current policy of inclusion were unlawful.

Id. at *6.

The Court also ruled that, as between the two policies, it was the pre-2000 policy of excluding section 1115 waiver days from the DSH calculation that was unlawful and violated the federal statutes. Id. at 6-9. Thus, there is no disputing that the NPR's that excluded section 1115 days from the DSH calculation could hardly be more "inconsistent with applicable law." It follows that the Interim Final Rule was a "notice" of inconsistency. Because the Secretary had no discretion to decide, on his own, to include section 1115 waiver days in the DSH calculation, the Interim Final Rule, as a matter of law, was therefore not an exercise of discretion by the Secretary. Rather, it was a correction. The change in reimbursement policy reflected in the Interim Final Rule was necessarily a "notice" that the prior approach (of excluding section 1115 waiver days) had been incorrect and therefore "inconsistent" with the law.

The Interim Final Rule is similar in the foregoing respect to Ruling 97-2, which was the "notice of inconsistency" that triggered mandamus under 42 C.F.R. § 405.1885(b) in both Monmouth and In Re: Medicare. The Secretary had exactly the same amount of discretion to exclude the patient days at issue in Monmouth and In Re: Medicare as he had here: none. Id. In both those cases, and in the present matter, the Secretary vigorously opposed the suggestion that his pronouncement had been a "notice of inconsistency." The Courts, however, in Monmouth Medical Center and In Re: Medicare, held that Ruling 97-2 was in fact a notice of inconsistency notwithstanding that the Ruling "expressly stated that closed decisions would not be reopened" and that the Secretary "did not concede that the prior interpretation was incorrect." In Re: Medicare, 30 F. Supp. 2d at 93-94. Indeed, the Circuit Court in Monmouth observed: "To be sure, [Ruling] 97-2 studiously avoided using the magic words 'inconsistent with the applicable law' . . . ." Monmouth, 257 F. 3d at 813. The Circuit Court nevertheless ruled that the Secretary was incorrect and that, by issuing Ruling 97-2, he had issued a notice of inconsistency under

section 405.1885(b).  Id. at 814.  The situation in those cases is no different from the situation

involving the Interim Final Rule in the present matter.

The Secretary attempts to distinguish Ruling 97-2 from the Interim Final Rule, reciting

that the court in Monmouth found that Ruling 97-2 described the prior policy (of excluding

eligible but unpaid Medicaid days) as contrary to the applicable law in four judicial circuits and

was therefore "tantamount" to a notice of inconsistency.  Secretary's Brief at 21.  What the

Secretary fails to realize is that the Interim Final Rule is at least analogous to the facts in

Monmouth, if not even more compelling.

On the day the Interim Final Rule took effect, the waiver program in Tennessee was

exactly the same as the day before.  The Medicare DSH statute was also the same.  The only

thing that changed was the Secretary's recognition that section 1115 waiver days constituted

Title XIX expenditures and that the section 1115 waiver days therefore belonged in the Medicare

DSH calculation.  The Secretary stated, in commentary accompanying the Interim Final Rule,

that "[o]ne purpose of a section 1115 expansion waiver is to extend Title XIX matching

payments to services furnished to populations that otherwise could not have been eligible for

Medicaid."  See Interim Final Rule, 65 Fed. Reg. 3136 (Jan. 20, 2000).  The Secretary

recognized that the days should be included, not because it was simply wise to do so, but rather

because it was the intent of Congress:

> [W]e believe allowing hospitals to include the section 1115
> expanded waiver population in the Medicare DSH calculation is
> fully consistent with the Congressional goals of the Medicare DSH
> adjustment to recognize the higher costs to hospitals of treating
> low income individuals covered under Medicaid.  Therefore,
> inpatient hospital days for these individuals eligible for Title XIX
> matching payments under a section 1115 waiver are to be included
> as Medicaid days for purposes of the Medicare DSH adjustment
> calculation.

Id. at 3137.

Based on the Secretary's own commentary, one can only conclude that the prior policy of excluding section 1115 waiver days was inconsistent with the Medicare statute, which required patient days associated with Title XIX expenditures (such as section 1115 waiver days) to be included in the DSH calculation. This statement, made by the Secretary himself, is, at the very least, "tantamount to a notice of inconsistency." Secretary's Brief at 21.

The Secretary's final attempt to distinguish Ruling 97-2 and the Interim Final Rule rests on the fact that the reimbursement policy that was reversed by Ruling 97-2 was encompassed "in a formal regulation, rather than a mere informal instruction." Secretary's brief at 22. This argument goes nowhere. The reopening regulation, 42 C.F.R. § 405.1885(b), does <u>not</u> require that the Secretary issue a notice that a prior <u>regulation</u> was inconsistent with the law, but rather, and only, that a prior "<u>intermediary determination</u>" was inconsistent with the law. <u>Id.</u> Whether the intermediary issued the payment determination because of a regulation or an "instruction" makes no difference. All that is required is that the payment determination be inconsistent with the law, and that the Secretary provide "notice" of this fact. Both requirements are met here. As explained at length above and by the Court in <u>Cookeville</u>, any NPR which excludes section 1115 waiver days from the DSH calculation is inconsistent with the Medicare statute.

**D.    The Deficit Reduction Act Does Not Apply To This Case And Does Not Make The Secretary's Past Payment Determinations "Consistent" With Applicable Law.**

The Secretary argues that the payment determinations at issue in this matter, which excluded section 1115 waiver days from the Medicare DSH calculation, are consistent with applicable law for purposes of 42 C.F.R. § 405.1885(b) because Congress has supposedly proclaimed this to be the case by virtue of the DRA. This argument fails for two reasons. First, this Court, not Congress, is constitutionally charged with interpreting the law. Thus, even if

Congress were to state that the Medicare statute—as it existed at the time that the NPR's were issued in the present matter—did not require the inclusion of section 1115 waiver days in the Medicare DSH calculation, it would still be the Court's constitutional role to decide whether, in its judgment, that was actually the case. Second, the Secretary's argument that Congress has acted so as to cure the unlawful payment determinations by enacting the DRA is also incorrect.

**1.    The DRA Amendment Is Not A "Clarification" of Existing Law, But Rather a Change in the Law that Cannot be Applied Retroactively**.

**a.    Because the Law Prior to the Amendment was Unambiguous, The Amendment Constitutes a Change in the law.**

During the pendency of this litigation, Congress passed the DRA, adding language to the Medicare DSH statute that now gives the Secretary the power—which both this Court in Cookeville and the Ninth Circuit in Portland Adventist had ruled under the existing law he did not heretofore possess—to exclude section 1115 waiver days from the Medicare DSH calculation, including expansion populations, even after he has approved the section 1115 waiver program to receive federal matching funds under Title XIX. The Secretary argues, in his motion to dismiss, that the new language is a "clarifi[cation]" of what the law has been since the enactment of the Medicare DSH statute in 1986.[10] The Secretary further argues that this Court's decision in Cookeville and the Ninth Circuit's decision in Portland Adventist were wrongly decided because the Courts' rulings turned out to be at odds with the new "clarifying" statutory language.[11] The Secretary's argument fails because the Amendment is a change in the law that cannot be applied retroactively.

_____

[10] See Secretary's Brief at 13.

[11] See id. at 18 n.4.

The first step in analyzing whether a statutory amendment is a "clarification" is whether the existing law is ambiguous. See McCreary v. Offner, 1 F. Supp. 2d 32, 36 (D.D.C. 1998), aff'd, 172 F.3d 76 (D.C. Cir. 1999); United States v. Ruiz-Batista, 956 F.2d 351, 353 (1st Cir. 1992); United States v. Montgomery County, 761 F.2d 998, 1003 (4th Cir. 1985). If a court finds the pre-amendment law to be unambiguous—as this Court and the Portland Adventist court have found—then the amendment is necessarily a change in the law which cannot be applied retroactively without violating, at the very least, the due process clause of the Fifth Amendment to the United States Constitution. See McCreary, 1 F. Supp. 2d at 36; Ruiz-Batista, 956 F.2d at 353; Montgomery County, 761 F.2d at 1003; see also Landgraf v. USI Film Products, 511 U.S. 244, 245 (1994); Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 44 (1976); Brown v. Secretary of the Army, 78 F.3d 645, 648-649 (D.C. Cir. 1996).

The analysis of whether the existing law is ambiguous is based on the statutes as they existed at the time. In other words, the language of the new legislation cannot be used by a litigant to create an ambiguity where none existed before. "[A] statute which has all along unambiguously proclaimed WHITE cannot retrospectively be made to assert BLACK just because the legislature, at the later date, says so." Montgomery County, 761 F.2d at 1003; see also Ruiz-Batista, 956 F.2d at 353. "The term 'clarification' begs the question." United States v. Hercules, 929 F. Supp. 1418, 1423 n.3 (D. Utah 1996). "Congress may refer to a change as a clarification, but the question is was it in fact a substantive change beyond the former legislation." Id.

This Court in Cookeville, and the Ninth Circuit in Portland Adventist, have already exhaustively examined the state of the law prior to the Amendment, regarding whether the Secretary, after approving a section 1115 waiver program to receive federal matching funds

under Title XIX, then has the power to exclude section 1115 waiver days from the Medicare

DSH calculation.  Both courts, as noted above, answered the question firmly in the negative as

part of their <u>Chevron</u>[12] analysis, stating that the statutes were unambiguous and that the

Secretary did not have that power.  <u>Cookeville</u>, 2005 WL 3276219, at *5-8; <u>Portland Adventist</u>,

399 F.3d at 1098, 1099, n.9.   Because the existing law is unambiguous, the Amendment can

only be construed as a change in the law that cannot be retroactively applied to the Hospitals'

lawsuit against the Secretary.

>       **b.     The <u>Loving v. United States</u> Line of Cases Do Not Support the
>               Secretary's Argument.**

Based upon the Secretary's arguments in support of his Motion to Alter Judgment in

<u>Cookeville</u>, it is anticipated that the Secretary, relying upon the decision in <u>Loving v. United</u>

<u>States</u>, 517 U.S. 748 (1996), will argue that subsequent legislation declaring the intent of an

earlier statute should be accorded great weight in statutory construction.  As explained below,

however, <u>Loving</u> was not a case in which the Court used a subsequently enacted law (i.e. a law

enacted subsequent to the suit and subsequent to the factual predicate of the case) to clarify an

earlier statute.  <u>Loving</u>, therefore, does not lend legal support to the Secretary's request that the

Amendment in the present matter be used as an interpretive tool, much less one that is accorded

great weight.

 <u>Loving</u> involved a murder committed by an army private in 1988 that resulted in a court

martial under the Uniform Code of Military Justice ("UCMJ").  The court martial imposed the

death penalty based on various aggravating factors.  <u>Loving</u>, 517 U.S. at 748.  The issue before

the Supreme Court was whether the President of the United States (by way of an Executive

---

[12] <u>Chevron v. Natural Res. Def. Council</u>, 467 U.S. 837 (1984).

Order issued in 1984) had the authority to designate which aggravating factors could be a basis for imposing the death penalty. Id. at 753-755 and 768-771. The Supreme Court found that the President possessed the requisite authority and used a 1985 Act of Congress to help shed light on the intent of Congress with respect to previously enacted laws. Id. at 770. The murder, however, occurred much later, in 1988, and the criminal suit followed. Thus, the Supreme Court did not use any statute enacted after the commission of the crime or the filing of the criminal suit in interpreting the UCMJ.

The arguments that the Secretary made in Cookeville, and is likely to assert in the instant matter, are a radical departure from Loving. In Loving, the Court used a law that was enacted three years before the criminal suit was filed in order to interpret an even older statute. In the present matter, however, the Secretary asks the Court to rely upon a law enacted in 2006, approximately six years after the NPR's in this case were issued. Because the Secretary's argument asks the Court to rely on a law enacted after the cause of action has accrued, and after suit was filed, Loving lends him no support.

The distinction between the Supreme Court's approach in Loving and the method of interpretation likely sought by the Secretary has been recognized by the Court of Appeals for the D.C. Circuit. Indeed, the Court of Appeals does not view the Secretary's approach as being sanctioned by Loving or by any other Supreme Court decision: "we are unaware of any Supreme Court holding in which a subsequent declaration [by Congress] has been used . . . to interpret the meaning of a statute *prior to the declaration*." United States ex rel. Long v. SCS Business and Technical Institute, 173 F.3d 870, 881 n.15 (D.C. Cir. 1999). The Amendment, using the nomenclature of the Court of Appeals, is a "subsequent declaration" and it cannot be used to "interpret the meaning" of the DSH statute for time periods "prior to the declaration," i.e. for

time periods prior to 2006, which is exactly what the Secretary is asking the Court to do in the present matter.

Perhaps even more important, in <u>Loving</u>, the 1985 law used by the Supreme Court as an interpretive tool did not conflict with the previously enacted laws that it was attempting to interpret.  In the present matter, however, the existing statutory DSH language is diametrically opposed to the language contained in the Amendment.  The existing language stated that once a State Plan of medical assistance is approved under Title XIX, the patient days for which a patient is eligible under that plan "shall" be included in the DSH calculation. <u>See</u> 42 U.S.C. § 1395ww(d)(5)(F).  No exceptions.  Now, under the Amendment, the Secretary has the power to make such exceptions and, at his discretion, exclude such patient days from the DSH calculation.  The scenario in the present matter is unlike <u>Loving</u>, and the Amendment can be accorded no weight as an interpretive tool.

Furthermore, in the context of budget legislation, purported "clarifications" of earlier congressional intent are not accorded great weight, but instead great skepticism.  Judge Posner, in a decision that has been cited by every subsequent Court of Appeals decision in the D.C. Circuit to address the issue, observed that "[t]here is an air of unreality in treating [budget legislation] as an attempted clarification of original statutory meaning…."  <u>Paramount Health Systems, Inc. v. Wright</u>, 138 F. 3d 706, 710 (7th Cir. 1998).[13]  In <u>Paramount</u>, the court was confronted with a purported clarification of law involving reimbursement for medical services provided to a particular category of Medicare beneficiaries who were also eligible for Medicaid coverage.  Judge Posner observed that "[t]he location of the 1997 amendments in a statute labeled the 'Balanced Budget Act' and concerned primarily with cutting the federal deficit

---

[13] The <u>Paramount</u> decision is cited by both the District Court and Court of Appeals in <u>McCreary</u>.

hardly creates confidence that Congress was, court-like, interpreting the 1986 statute." Id.  In

deciding what weight to give to the purported clarification, Judge Posner concluded: "rather little

in the circumstances." Id. at 711.  When the Court in Paramount ultimately ruled that the 1997

amendment was a "clarification," it was not because of any great weight accorded to the

purported declaration by Congress in the 1997 amendment, but rather because the prior law was

a "hopeless muddle" and there was "sufficient ambiguity to require us to defer to the

government." Id. at 711.[14]  That is not the case in the present matter.

The two specific statutory provisions at issue in this case are the Medicare DSH

calculation and the section 1115 waiver provision.  Cookeville, 2005 WL 3276219, at *8

(discussing 42 U.S.C. § 1395ww(d)(5)(F)(vi) and  42 U.S.C. § 1315).  As noted in the Statement

of Facts above, this Court, after conducting a comprehensive analysis of these provisions, found

them to be straightforward, clear, and plainly unambiguous:  "[T]he DSH formula

unambiguously includes all patients eligible for medical assistance under Title XIX, regardless

of the mechanism by which they become eligible.  This includes those patients who would not

otherwise have been eligible for Medicaid but for the § 1115 waiver provision." Id.  This Court

held that "Congress has spoken clearly through these statutes, I do not need to address whether

the Secretary's policy was a 'permissible' interpretation of the statute [under] Chevron U.S.A.,

Inc. 467 U.S. at 843." Id. at *9.

The United States District Court for the District of Oregon, as well as the Court of

Appeals for the Ninth Circuit, reached exactly the same conclusion that this Court reached in

Cookeville, on exactly the same issue.  See Portland Adventist, 399 F.3d at 1099.  The Secretary,

---

14 In the McCreary case, the Circuit Court of Appeals found the existing law regarding Qualified
   Medicare Beneficiaries to be ambiguous and decided the case on that basis, as did the District
   Court.

after losing the case at the Court of Appeals, did not contest the Court's ruling and did not file a petition for certiorari.

The analysis performed by this Court in <u>Cookeville</u> and the Ninth Circuit in <u>Portland Adventist</u> illustrates, at every turn, the clarity of the DSH statute as well as the clarity of the section 1115 waiver provisions. In accordance with the foregoing, the decisions in <u>Cookeville</u> and <u>Portland Adventist</u> preclude a finding of ambiguity. This is not a case in which the existing law is ambiguous or too close to call. The DRA Amendment is not a clarification, but rather a substantive change in the law. Accordingly, the Secretary's Motion to Dismiss should be denied.

<strong>c.    The Secretary's Likely Reliance Upon <u>Beverly v. Shalala</u> is Misplaced.</strong>

It is anticipated, based upon his arguments in <u>Cookeville</u>, that the Secretary will also analogize the DRA to the statutory provision at issue in <u>Beverly v. Shalala</u>, 132 F.3d 1259 (9th Cir. 1997). The <u>Beverly</u> case dealt with the same issue that was addressed by Judge Posner in <u>Paramount</u>, 138 F.3d at 710, which is discussed at length in the previous section. In both the <u>Beverly</u> and <u>Paramount</u> cases, the courts were confronted with a purported clarification of a statute involving reimbursement of medical services provided to a particular category of Medicare beneficiaries who were also eligible for Medicaid coverage. <u>Beverly</u>, 132 F. 3d at 1265-1266; <u>Paramount</u>, 138 F.3d at 710. Unlike the situation with the DRA, Congress, in the new legislation in <u>Beverly</u> and <u>Paramount</u>, "was deliberately targeting what were known to be existing disputes on this subject [and] went on to prescribe a retroactive effective date of the quoted amendment. . . ." <u>Beverly</u>, 132 F.3d at 1264. The purpose of the new law at issue in <u>Beverly</u> and <u>Paramount</u> was to point a loaded gun at the plaintiffs' lawsuits and pull the trigger:

> (c) Effective Date— . . . . The amendments made by subsection (a) shall also apply to payment by a State for items and services furnished before such date if such payment is the subject of a law suit that is based on the provisions of sections 1902(n) and 1905(p)

>of the Social Security Act and that is pending as of, or initiated
>after, the date of the enactment of this Act."

Id.

As seen in the quoted statutory section from the holding in <u>Beverly</u> above, the express

purpose of the legislation in that case was to terminate retroactively in the government's favor all

lawsuits regarding the Medicare/Medicaid issue being reviewed by the courts.  In the present

matter, section 5002(a) of the DRA does not purport to be retroactive in any respect, let alone

"target" a specific category of lawsuits for annihilation as was the case in <u>Beverly</u>.

Furthermore, the holding in <u>Beverly</u> does not aid the Secretary in his statutory

"clarification" argument.  The Ninth Circuit in <u>Beverly</u> was explicit: "[I]t does not matter

whether the congressional labeling of the new legislation as simply a 'clarification' has to be

credited by a court . . . . What is instead significant is that Congress' characterization plainly

reflects its intention to resolve every still-live dispute in the manner specified by the new

legislation."  <u>Id.</u> at 1264.  Although the Ninth Circuit eventually reached the clarification issue, it

found a Congressional intent to clarify based primarily on the retroactivity provisions found in

the new law.  The fact that the new provision was labeled a "clarification" was of little

significance because the title "clarification" "rather than merely resolving an ambiguity, parallels

the provision in [the new act] that specifically makes the statute applicable to pre-Act services

involved in pending litigation."  <u>Beverly</u>, 132 F.3d at n.6.

In the instances of <u>Beverly</u> and <u>Paramount</u> (which both dealt with the same new

legislative provision), the Circuit Courts found the pre-existing law on the issue to be "baffling,"

subject to different interpretation by different courts, and, in the words of Judge Posner, a

"hopeless muddle."  <u>Beverly</u> 132 F.3d at 1266; <u>Paramount Health Systems</u>, 138 F.3d at 711.

Thus, in those cases, there really was something to clarify.  In the present matter, however, there

is nothing to clarify.  The Medicare DSH statute is unambiguous and readily susceptible to consistent interpretation.[15]  With respect to the specific section 1115 waiver day issue in this case, the courts that have ruled on the issue—the District Court for the District of Oregon, the Ninth Circuit Court of Appeals, and this Court—have all found the Medicare DSH statute to be clear on its face and that it unambiguously requires the inclusion of the section 1115 waiver days in the DSH calculation.  The Secretary's assertion that the new law is a "clarification" would require that the Court turn a blind eye to a wealth of decisional law that has found the DSH calculation to be straightforward and unambiguous—and uniformly unambiguous as to the inclusion of section 1115 waiver days.

>    **d.    The Use of the Word "Clarification" in the DRA Amendment is Not Determinative.**

The Secretary is likely to argue, as he did in <u>Cookeville</u>, that the word "clarification," which appears in Section 5002, should be treated as commanding evidence in favor of retrospectivity.  In making this argument in <u>Cookeville</u>, however, the Secretary, in addition to citing an out-of-jurisdiction case for this proposition—<u>Department of Toxic Substances Control v. Interstate Non-Ferrous Corporation</u>, 99 F. Supp. 2d 1123 (E.D. Cal. 2000)—failed to be faithful to the decision he cited.  For example, the Court in <u>Department of Toxic Substances</u> starts its analysis, not with the wording of the new Act, but rather with an inquiry into whether "ambiguity existed with respect to the interpretation of the relevant provision when the amendment was enacted."  <u>Id.</u> at 1129 (citation omitted).  In the present matter, as explained at length above, there was no such ambiguity.  It follows that, irrespective of Section 5002's use of

---

[15] <u>See</u> <u>Monmouth</u>, 257 F.3d at 814; <u>In Re: Medicare</u>, 414 F.3d at 10; <u>Alhambra Hosp. v. Thompson</u>, 259 F.3d 1071, 1076 (9th Cir. 2001);  <u>Cabell Huntington</u>, 101 F.3d at 991;  <u>Legacy Emanuel Hosp.</u>, 97 F.3d at 1266;  <u>Jewish Hosp.</u>, 19 F.3d at 274-275;  <u>Deaconess</u>, 912 F.Supp. at 448.

the word "clarification" in the title of the Amendment, Section 5002 of the DRA is a change in the law and not a clarification.

Additionally, in order for an amendment to be a "clarification" and have retroactive effect, there must be express language intending a retrospective result. The statute at issue in Department of Toxic Substances was clear on this point and contained a specific provision which delineated the cases to which the new provision would and would not apply:

> (i) Effect On Pending Or Concluded Actions.—The exemptions provided in this section shall not affect any concluded judicial or administrative action or any pending judicial action initiated by the United States prior to enactment of this section.

Id. at 1130. There is no comparable provision in Section 5002 of the DRA that would outline or even hint at similar subject matter. This is another fact which demonstrates that section 5002 is not a "clarification" and should not have retrospective effect.

The court in Department of Toxic Resources observed that when Congress "clarifies" a statute and intends retrospective effect, it must also add language to the statute to "show how the law originally was intended to operate." Id. at 1133. In Department of Toxic Resources, Congress did this by adding the word "'clarification' three times in the operative liability provisions of the statute's text…." Id. (emphasis added). In the present matter, in Section 5002, the word "clarification" has not been made part of the Medicare statute in any respect, but is rather only included in the text of the DRA. The necessary, explicit language has not been added to the DSH statute—as was clearly the case in the statute at issue in Department of Toxic Resources—that would allow for a finding of a "clarification" and retrospective effect. Thus, this factor has also not been met.[16]

---

[16] The Secretary is also likely to rely upon United States ex rel. Long v. SCS Business Technical Institute, 173 F.3d 870 (D.C. Cir. 1999) to support his argument that the Amendment is a

Continued on following page

e.    **The Change in Law Set Forth at Section 5002(a) of the DRA Cannot Be Applied Retroactively.**

It is also anticipated that the Secretary will argue, as he did in <u>Cookeville</u>, that Section 5002 of the DRA controls the outcome of the present matter <u>irrespective</u> of whether it is a clarification or a substantive change of the law.  This argument, should it be made by the Secretary, is without merit.  The DRA does not control the outcome of this matter if section 5002(a) is found to be a change in the DSH statute, because the effect of the DRA would be retroactive.  Retroactive legislation is heavily disfavored and courts will not countenance a retroactive effect unless there is a clear and explicit expression in the statute that Congress intended the provision to be retroactive.  <u>See</u> <u>Rivers v. Roadway Express, Inc.</u>, 511 U.S. 298, 307-310 (1994); <u>Bowen v. Georgetown Univ. Hosp.</u>, 488 U.S. 204, 208 (1988).

The Secretary, in <u>Cookeville</u>, argued this point in the alternative, stating that even assuming for the sake of argument that Section 5002 changes the DSH payment rules, it is nonetheless controlling in this case.  The Secretary, by assuming that the DSH payment rules have been retroactively changed by the DRA, was necessarily taking the position that Section 5002(a) of the DRA has bestowed upon him a power he did not previously possess, one which allows him to change the statutory DSH calculation that previously was in effect for patient discharges from 1994 through 2000.  By doing so, he would be changing the calculation so as to exclude section 1115 waiver days from that calculation.  Under the Secretary's scenario, put forth in <u>Cookeville</u>, his pre-existing obligation to pay DSH funds (with section 1115 waiver days included) that existed when the Hospitals rendered inpatient services, filed their cost reports, and

_____

Continued from previous page

clarification.  However, there is nothing in that decision that allows for the use of a subsequent statutory amendment to govern the interpretation pre-existing statutory text.  Indeed, as the court makes clear in <u>Long</u>, such a use of subsequent legislation is not allowable.

were issued Notices of Program Reimbursement by the Secretary's fiscal intermediaries—have

now been removed, after the fact.

Such a change in payment rules is the epitome of retroactivity. "The inquiry into whether

a statute operates retroactively demands a commonsense, functional judgment about whether the

new provision attaches new legal consequences to events completed before its enactment." INS

v. St. Cyr, 533 U.S. 289, 321 (2001)(citation omitted). "A statute has retroactive effect when it

takes away or impairs vested rights acquired under existing laws, or creates a new obligation,

imposes a new duty, or attaches a new disability, in respect to transactions or considerations

already past." Id. (citation omitted). The judgment as to whether a particular statute "acts

retroactively should be informed and guided by familiar considerations of fair notice, reasonable

reliance, and settled expectations." Id. (citation omitted). A new statutory provision cannot

"attach[] a new disability, in respect to transactions or considerations already past." Id. (citation

omitted). Here, any attempt by the Secretary to change the Medicare DSH calculation, going

back to patient discharges between 1994 and 2000, is the epitome of unfair notice and plainly

disrupts reasonable reliance and settled expectations of how the Medicare DSH calculation

would be calculated.

The Supreme Court law on the issue of retroactivity establishes a heavy presumption

against the retroactive application of statutes and will only permit such an effect if there is a clear

statement, in the statute, requiring retroactivity. See Rivers v. Roadway Express, 511 U.S. at

307-310. In order for a statute to be validly retroactive, it must contain a "clear expression of

congressional intent to reach cases that arose before its enactment." Id. at 307 (emphasis added).

"Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules

will not be construed to have retroactive effect unless their language requires this result."

Bowen, 488 U.S. at 208.

In Rivers v. Roadway, the statutory provision at issue was section 101 of the Civil Rights Act of 1991 ("the 1991 Act"). The Court found that the 1991 Act "lacks any direct reference to cases arising before its enactment" and that "[a]ltering statutory definitions, or adding new definitions of terms previously undefined, is a common way of amending statutes, and simply does not answer the retroactivity question." Rivers, 511 U.S. at 308. Indeed, a statement by Congress that it intended to "restore" the proper application of the law also did not "supply sufficient evidence of a clear congressional intent to overcome the presumption against statutory retroactivity." Id. at 309. Even when Congress passes a clearly "corrective amendment," Congress's "intent to reach conduct preceding the 'corrective' amendment must clearly appear." Id. at 313.[17] As in Rivers v. Roadway, Section 5002(a) does not even mention the word "retroactive," let alone set up express parameters of which cases, if any, are to be the subject of retroactive application. Accordingly, the same judicial result should obtain as in that case, and Section 5002(a) of the DRA must not be applied retroactively.

It should be noted that the Secretary's argument on the retroactivity issue will likely be based, in large part, on cases that actually support the Hospitals' position that Section 5002(a) of

---

[17] The construction urged by the Hospitals is consistent with Section 5002(a). The 1991 Act at issue in Rivers v. Roadway is similar to Section 5002(a) of the DRA insofar as there exists a rational way to read the statute, and have it be effective, without being retroactive. In Rivers v. Roadway, section 101 of the 1991 Act was "plainly not the sort of provision that must be read to apply to pending cases because a contrary reading would render it ineffective." Id. at 311 (citation omitted). In the case of the DRA, the statement that the Secretary has the authority to include or exclude waiver days in the DSH calculation would not be rendered ineffective because waiver programs still exist and, in fact, still exist in all of the States that had them when this Court rendered its decision on October 28, 2005. In other words, Section 5002(a) makes perfect sense as a prospective piece of legislation, explaining the nature of the Secretary's new authority, as of the date of the DRA was enacted.

the DRA cannot be applied retroactively. For example, in <u>Cookeville</u>, the Secretary cited the Supreme Court's decision in <u>Landgraf</u> in arguing that Congress may require that new statutes be applied in cases not yet final and that absent a violation of one of the Constitution's specific provisions, the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope. The Secretary's reference to <u>Landgraf</u>, however, speaks only to the <u>power</u> of Congress to enact retroactive legislation, a power which is not at issue in this litigation. The issue in the present matter is whether Congress has in fact enacted such legislation and exercised that power.

On this latter point, the Supreme Court's decision in <u>Landgraf</u> reiterates the heavy presumption against the retroactive application of statutes, describing the presumption as "well-settled." <u>Landgraf</u>, 511 U.S. at 277. The Secretary in <u>Cookeville</u> ignored this rule of law, quoting the Supreme Court's decision nearly 200 years earlier in <u>United States v. Schooner Peggy</u>, 5 U.S. (1 Cranch) 103, 110 (1801) ("the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, that judgment must be set aside."). Unfortunately for the Secretary, the Supreme Court's holding in <u>Landgraf</u> specifically limits and distinguishes the Court's prior decision in <u>Schooner Peggy</u>. The <u>Landgraf</u> Court noted that the only reason the law at issue in <u>Schooner Peggy</u> defeated the presumption against retroactivity—which existed even then—was because the law "had expressly called for retroactive application." <u>Landgraf</u> at n.31. Section 5002(a) of the DRA, which addresses the Secretary's authority to include or exclude section 1115 waiver days at his discretion, does not call for retroactive application in any respect, much less in the "express" fashion that would pass muster under the presumption set in place by the Supreme Court.

- 33 -

The Secretary, in <u>Cookeville</u>, also relied upon the decision in <u>Bradley v. School Bd. Of Richmond</u>, 416 U.S. 696 (1974).  The <u>Landgraf</u> Court limited the holding of this case as well: "we now make it clear that <u>Bradley</u> did not alter the well-settled presumption against application of the class of new statutes that would have genuinely 'retroactive' effect." <u>Landgraf</u>, 511 U.S. at 277.  "[W]e did not intend to displace the traditional presumption against applying statutes affecting substantive rights, liabilities, or duties [as] to conduct arising before their enactment." <u>Id.</u> at 278.

In light of the foregoing, the Secretary's anticipated argument that a change in law must be automatically applied to prior conduct, cannot survive judicial scrutiny, and the Secretary's motion to dismiss must be denied.

    **2.  The Amendment's Purported "Ratification" of the Secretary's Regulations is Not, as The Secretary Asserts, Fatal to the Hospitals' Claims in This Matter.**

        **a.  Ratification Does Not Apply in This Case Because the Elements of Ratification Have Not Been Satisfied.**

In order for a litigant to assert successfully that Congress has ratified an agency's prior conduct, the litigant must show that Congress has "at least express[ed] its clear recognition of the illegal nature of the [agency action], and its explicit intent to ratify that [action]." <u>Thomas v. Network Solutions, Inc.</u>, No. 97-2412 TFH, 1998 WL 1738180 at *3 (D.D.C. 1998), aff'd, 176 F. 3d 500 (D.C. Cir. 1999).  Here, as explained below, the Secretary is unable to show the existence of either.

First, the Amendment does not express any recognition—let alone the requisite "clear recognition"— that either the regulations or policies described at 65 Fed. Reg. 3136 (Jan. 20, 2000) or 68 Fed. Reg. 45345 et seq. (Aug. 1, 2003) were unlawful or illegal.  Indeed, Congress does not allude to the existence of any impropriety at all, real or alleged, regarding the

Secretary's historical exclusion of expansion populations from the DSH calculation. Thus, the Secretary fails to establish the first necessary element of ratification, that the Amendment express a recognition that the agency conduct was unlawful.

Second, the Amendment does not provide evidence of any explicit intent to ratify the exclusion of expansion populations for the hospitals and cost reports that are the subject of this suit. In fact, the contrary is true. The Amendment, on its face, explicitly calls for only a "prospective application of previous regulations" and does not explicitly refer to the exclusion of expansion populations from the DSH calculation. This is in stark contrast to the legislative language at issue in Thomas v. Network Solutions, Inc., in which Congress identified the specific lawsuit in which ratification was sought. The Fiscal Year 1998 Supplemental Appropriations and Rescissions Act (which was at issue in the Thomas case) identified the litigation "by name and by its district court docket number; it accurately describe[d] the district court's holding; it specifie[d] the precise period when the Preservation Assessment was collected; and it mirror[ed] the language the district court used . . . ." Thomas, 176 F.3d at 506. Congress is thus fully capable of being explicit in order to effect a ratification. It has not been explicit in the present matter. The Secretary has failed to establish this element of ratification. Based on all of the foregoing, the Secretary's Motion to Dismiss should be denied.

> **b.    Ratification of the Secretary's Regulations, Even if Otherwise Applicable, Would Not Result In The Dismissal Of The Hospitals' Claims Against the Secretary.**

In Cookeville, this Court ruled in favor of the Hospitals based entirely upon the Medicare DSH statute and the statutory language contained in section 1115. The Court ruled: "Because I find that Congress has spoken clearly through these statutes, I do not need to address whether the Secretary's policy was a 'permissible' interpretation of the statute." Cookeville, 2005 WL

3276219, at *8. This Court, finding, correctly, that the statute clearly mandated the inclusion of section 1115 waiver days in the DSH calculation, invalidated the Secretary's policy of excluding the days. Congress had spoken plainly, and that was the end of the matter. Id.

The Secretary now contends that because his policies contained in the DSH regulations have been ratified by the Amendment, this Court should reverse the Cookeville decision and grant his motion to dismiss in the instant matter. The Secretary's position in both Cookeville and the instant matter is unfounded. First, prior to January 20, 2000, the Secretary had not promulgated any regulation regarding how to treat waiver days in the context of DSH, let alone promulgate a regulation requiring the exclusion of such days. The first regulation addressing waiver days and the DSH calculation was promulgated on January 20, 2000, and it required that waiver days be included in the DSH calculation beginning with patient discharges on that date. See 42 C.F.R. § 412.106. As explained in point headings "C" and "D" below, that regulation was prospective only and did not call for the exclusion of waiver days for any time period. Because there has never been a regulation requiring that waiver days be excluded from the DSH calculation, there exists no regulation that, if ratified, could serve as a basis for excluding those days now. It is almost beside the point to discuss the issue of ratification any further. Nevertheless, because the Secretary has raised the issue, it is important that the Court be made aware that, even if the regulations were written much differently, so as to militate in the Secretary's favor, ratification would still be impossible here.

The decisional law dealing with ratification allows Congress to ratify unlawful agency action, but only in instances in which the agency acted pursuant to a law that was later deemed to be unconstitutional or acted without statutory authority—as opposed to acting in a manner that conflicted with its statutory authority. A review of the decisional law fails to reveal any instance

in which a court has sanctioned Congressional ratification of agency action that was prohibited by a valid statute at the time the agency acted.[18]

In the present matter, the fiscal intermediary refused to include the waiver days in the Hospitals' DSH calculations in violation of the Medicare statute that required the days to be included.  See Cookeville, 2005 WL 3276219, at *7.  The fiscal intermediary, by failing to include the waiver days, did not exceed its authority, but rather broke the law by violating the Medicare statute.  There is no decisional law regarding ratification which allows for this kind of violation to be ratified, cured, or otherwise undone.

Moreover, the Amendment, although allowing the Secretary to prospectively exclude waiver days, does not contain so much as a single word suggesting that the Secretary's new found power can be applied retroactively:

> In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI.

---

[18] See Thomas, 176 F. 3d at 505 (holding that the National Science Foundation's grant of authorization to Network Solutions, Inc., to impose an annual fee on registrants of domain names, was an insufficient legal basis for the fee which was, in actuality, a tax; but that Congress could subsequently ratify the tax); American Federation of Government Employees v. District of Columbia Financial Responsibility and Management Assistance Authority, 133 F. Supp. 2d 75, 77 (D.D.C. 2001)(holding that the District of Columbia "had exceeded its statutory authority" in setting standards for overtime pay for all District employees, but that the standards could be ratified); Equal Employment Opportunity Commission v. Merrill Lynch, 677 F. Supp. 918, 920-21 (N.D. Ill. 1987) (holding that agency action taken pursuant to an unconstitutional act can later be ratified so long as Congress could constitutionally impose the specific provisions at issue).

See DRA, Sec. 5002 (a).  Because Congress has made no attempt to change the statute

retroactively, the unlawful exclusion of the waiver days remains just that, unlawful, no matter

what is done with respect to the regulations.

As explained below, the regulations themselves do not call for the exclusion of the

waiver days, and the Amendment does not purport to be retroactive.

> **c.**    **The DRA Amendment Does Not Purport to be Retroactive to the Hospitals and Cost Report Periods at Issue in this Litigation.**

The DRA Amendment, on its face, only purports to ratify the Secretary's regulations

"effective as of the date of their respective promulgations."  DRA, Section 5002(b)(1).  The

Secretary promulgated the regulation at issue, 42 C.F.R. § 412.106, on January 20, 2000.  By its

terms, it was only effective for patient discharges on or after that date.  See 42 C.F.R. §

412.106(b)(4)(ii) (stating it is "[e]ffective with discharges occurring on or after January 20, 2000,

for purposes of counting days under paragraph (b)(4)(i) . . . .).  The regulation, for the

Secretary's purposes here, is a dead end.

Furthermore, if the Secretary looks outside the regulation, to the commentary to the

regulation, he fares no better.  It, too, states that the promulgation that occurred on January 20,

2000 was effective beginning on that date and did not apply to prior time periods or prior patient

discharges.  See 65 Fed. Reg. 3136 (Jan. 20, 2000).  The promulgation states:

> **Dates:** *Effective date*: January 20, 2000
> *Applicability Date*: These regulations are applicable to
> discharges occurring on or after January 20, 2000.

Id.

All of the patient discharges at issue in this case occurred prior to January 20, 2000.  It

follows that, whatever it was, exactly, that Congress ratified by way of the Amendment, it started

with patient discharges on or after January 20, 2000.  Indeed, Section 5002(b) is entitled

"Prospective Application of Previous Regulations."  Any other interpretation would imply an intent that is absent from the plain wording of the provision.  This is another separate and independent ground upon which the Court should deny the Secretary's Motion to Dismiss.

       **d.**     **The Act Does Not Purport to Ratify the Exclusion of Expansion Populations from the DSH Calculation.**

The Amendment does not describe what "policy" it is attempting to ratify and instead simply states that it is ratifying "regulations promulgated on January 20, 2000, at 65 Federal Register 3136 et seq., including the policy in such regulations regarding discharges occurring prior to January 20, 2000."  <u>See</u> DRA, Section 5002(b)(3)(A).  The only "policy" contained in the regulation, however, was that waiver days for patient discharges after January 20, 2000 would be <u>included</u> in the Medicare DSH calculation.  The regulation makes no mention and sets forth no policy regarding the exclusion of expansion populations (or the exclusion of any other type of patient day for that matter):

> **§ 412.106 Special treatment: Hospitals that serve a disproportionate share of low-income patients.**
>        \* \* \* \* \*
> (b) Determination of a hospital's disproportionate patient percentage.
>        \* \* \*
> (4) Second computation. \* \* \*
> (ii) Effective with discharges occurring on or after January 20, 2000, for purposes of counting days under paragraph (b)(4)(i) of this section, hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act.

65 Fed. Reg. at 3139.

There is simply no policy of excluding waiver days which is contained in the regulation. The only reference to such a policy is contained in the commentary contained in the Federal Register.  In order for the Secretary to meet his burden of showing an "explicit" intent to ratify, the legislative language would need to state that the subject of the ratification was the "policy" discussed in the commentary in the Federal Register and state that the policy consisted of the exclusion of waiver days for patient discharges prior to January 20, 2000.  The Act does neither of these things.

## CONCLUSION

Based on all of the foregoing, the Secretary's motion to dismiss must be denied.


Respectfully submitted,


 _/s/ Jacqueline E. Bennett_____
Murray J. Klein
DC Bar #492415
Jacqueline E. Bennett
DC Bar #474355
**REED SMITH LLP**
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, DC  20005
(202) 414-9200
(202) 414-9299 facsimile
JBennett@ReedSmith.com


Dated:  August 30, 2006